**UNITED STATES of America**

v.

**Alfred Lee WEINBERG, Morgan Bird, Sr., Appellants.**

**Nos. 11573, 11574.**

United States Court of Appeals Third Circuit.

Argued June 16, 1955.

Decided Sept. 23, 1955.

Rehearing Denied Oct. 14, 1955.

Johnston & Pope, Roy B. Pope, Wilkes-Barre, Pa., for appellant Alfred Lee Weinberg.

Max Rosenn, Rosenn, Jenkins & Greenwald, Wilkes-Barre, Pa., (Morgan Bird, Sr., on the brief), for appellant.

Isaiah Matlack, Dept. of Justice, Washington, D. C. (Warren Olney, III, Asst. Atty. Gen., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The indictment in this matter charged that in connection with certain schools for veterans the defendants did "conspire, confederate and agree together and with each other and with Arthur B. Jenkins, John F. Yekel and Louis Shaffer who are named herein as co-conspirators but not indicted, to defraud the United States out of certain monies by fraudulently inflating the cost basis of the tuition rate and by fraudulently inflating and increasing the cost to be charged to the Veterans Administration of furnishing to said veterans the books, supplies and equipment necessary for the satisfactory pursuit and completion of the courses of education and training in which they were enrolled."

The indictment went on to allege that: "It was a part of said scheme and plan that the defendants Morgan Bird, Sr., and Alfred Lee Weinberg would not permit the said Schools to purchase consumable instructional supplies, and books, supplies, and equipment at the lowest possible cost available to said Schools but would organize a separate and independent corporation, the Mercury Distributors Inc., which would be used by said defendants for the purpose of purchasing consumable instructional supplies and the books, supplies, and equipment at the lowest possible cost and reselling such supplies and material to the various Schools at an increased price far above the actual cost and at a substantial profit to said Mercury Distributors, Inc., and the defendants Morgan Bird, Sr., and Alfred Lee Weinberg. The said defendants

agreed that the defendant Weinberg, would direct that orders for such consumable instructional supplies and for books, supplies and equipment be placed by said Schools through the Mercury Distributors, Inc., and that the Mercury Distributors, Inc., would then purchase said supplies and material at the actual cost prices therefor and add to said prices large and inflated mark-ups and then resell the same to said Schools at exorbitant and inflated prices and in excess of the price at which the Schools could themselves purchase consumable instructional supplies and books, supplies and equipment in the open market place. The said defendants agreed that the defendant Weinberg would cause the aforesaid Schools to represent to the Veterans Administration that the actual and true cost of said consumable instructional supplies and said books, supplies, and equipment was the exorbitant and inflated price which the Schools were required to pay to said Mercury Distributors, Inc., and would cause the said Schools to submit to the Veterans Administration an inflated cost of operation as a basis for determining the tuition rate to be paid said Schools and to present vouchers and claims upon the United States to the Veterans Administration for reimbursement for the cost of said books, supplies, and equipment at the inflated prices."

The so-called conspiracy statute under which the above indictment was brought, 18 U.S.C. § 371, reads:

"*If two or more persons conspire* either to commit any offense against the United States, or *to defraud the United States, or any agency thereof in any manner or for any purpose,* and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. * * *" (Emphasis supplied.)

We are concerned here with only the second part of this statute which we have emphasized above. In other words the crime charged by the Government is not a conspiracy to commit an offense against a particular section of the Veterans Act but rather an ordinary conspiracy to defraud the United States or an agency thereof. Appellants allege that the indictment does not set forth sufficient facts to charge this crime. We think it does.

The scheme as asserted by the Government was simple and effective. The defendants inflated the cost basis of the schools by creating a dummy corporation (Mercury) through which they sold supplies and tools to the schools taking an unwarranted middleman's profit. Appellants protest at length that there was no manipulation of the accounts of Mercury or the schools and therefore no crime. The vice of the situation as urged and proved by the Government was not entries false on their face but the basic wrong of foisting upon the true expense for the schools, the school owners and managers themselves as an utterly unnecessary selling agent which collected an unconscionable profit completely contrary to the intent of the Act.

The premise of the Government's fundamental contention was firmly established. The appellants, admittedly owners of the schools involved, were shown to be the real organizers and owners of the Mercury corporation which furnished the supplies and materials to the schools. There was credible evidence that the schools could have bought those items direct from the manufacturers at the same low wholesale prices as Mercury and that the total overpayment by the Veterans Administration to the schools based on the percentage of gross profit to Mercury was $67,407.30.[1] According to Government proof $15,025.88 of this was for tools not even purchased by the schools or Mercury.

To the extent that a legal apparatus was used to achieve a fraudulent end, this case is analogous to the situation that confronted the Supreme Court two

---

1. Whether the conspiracy was actually successful to this degree is not relevant.

years ago in Lutwak v. United States, 1953, 344 U.S. 604, 73 S.Ct. 481, 485, 97 L.Ed. 593. Lutwak and his co-defendants were convicted of conspiring to defraud the United States by obtaining the illegal entry of three aliens into the United States. The method used was to have three honorably discharged veterans journey to Paris and marry three aliens who would then be brought into this country under the War Brides Act, 59 Stat. 659. Answering the contention, seriously urged, that the conspiracy "was not unlawful because the marriages involved were valid marriages", the majority of the Supreme Court stated in 344 U.S. at page 611, 73 S.Ct. at page 486:

"We do not believe that the validity of the marriages is material. No one is being prosecuted for an offense against the marital relation. We consider the marriage ceremonies only as a part of the conspiracy to defraud the United States and to commit offenses against the United States. In the circumstances of this case, the ceremonies were only a step in the fraudulent scheme and actions taken by the parties to the conspiracy. By directing in the War Brides Act that 'alien spouses' of citizen war veterans should be admitted into this country, Congress intended to make it possible for veterans who had married aliens to have their families join them in this country without the long delay involved in qualifying under the proper immigration quota. Congress did not intend to provide aliens with an easy means of circumventing the quota system by fake marriages in which neither of the parties ever intended to enter into the marital relationship; that petitioners so believed is evidenced by their care in concealing from the immigration authorities that the ostensible husbands and wives were to separate immediately after their entry into this country and were never to live together as husband and wife. The common understanding of a mar-riage, which Congress must have had in mind when it made provision for 'alien *spouses*' in the War Brides Act, is that the two parties have undertaken to establish a life together and assume certain duties and obligations. Such was not the case here, or so the jury might reasonably have found."

In our own case the validity of the corporate organization of Mercury is not material. Nor do we dispute the right of a bona fide middleman in appropriate circumstances to a legitimate profit. Here, however, the formation of Mercury by the school directors constituted an important step in their scheme to defraud the Veterans Administration, an agency of the United States, by inflating the costs of the schools.

Congress passed the " 'Servicemen's Readjustment Act of 1944' ", 38 U.S.C.A. § 693 et seq., in order to "provide Federal Government aid for the readjustment in civilian life of returning World War II veterans." 58 Stat. 284 (1944). The educational features of the Act gave eligible veterans the opportunity to obtain vocational training at the Government's expense. To this end, the Act empowered the Veterans Administrator to pay to the training institution which the veteran attended "the customary cost of tuition" and to "pay for books, supplies, equipment, and other necessary expenses * * *;" and where there was "no established tuition fee" the Administrator was to provide for "fair and reasonable compensation * * *." 58 Stat. 289 (1944). Under the Veterans Administration regulations, the school was required to submit cost data annually in order to aid the Veterans Administration in determining the proper tuition rate. As for supplies, each institution was required to "assure itself that the Veterans' Administration is not billed at an unreasonable price." 38 C.F.R. § 21.539(e).

█ If within the scope of this high purposed Act school directors can line their own pockets by deliberately or-

ganizing and using one unnecessary corporate middleman, then it is as fair for them to use three or four intervening corporations thus raising the ultimate government-borne cost by three or four unnecessary mark-ups. The intent and language of the legislation together with the regulations promulgated thereunder persuade us that Congress did not wish either to legitimize or to underwrite such unscrupulous scheming. As the indictment asserts, we think "it was understood that the cost charged by the Schools to the Veterans Administration would be the actual, real, true, and accurate cost of such books, supplies, and equipment."

██ In United States v. Furer, D.C. S.D.Cal.1942, 47 F.Supp. 402, 403, a trial quite similar to this one, Lockheed and Vega Aircraft Corporations had " 'cost plus fixed fee' " contracts with the United States Government for the construction of military airplanes. Furer and his co-defendants were indicted for conspiring to defraud the United States. Their fraudulent plan was to procure subcontracts for parts from Lockheed and Vega by bribing employees of those corporations. Unlike our situation, there was no allegation that the United States suffered any pecuniary loss. Nevertheless the court overruled demurrers to the indictment and stated at page 405:

"Through the arrangement, set forth in the indictment, for the construction of airplanes on a 'fixed fee' or 'cost-plus fee contract', the airplane corporations became the agents of the United States in letting the contracts (or subcontracts) for parts. * * *

* * * * * *

"For, by the bribery of the employes of the corporations, the Government is deprived of open and competitive bidding in the letting of its contracts. And considerations of worth, which should enter into awards of contracts in fulfillment of governmental undertakings, are brought to naught."

In the case at bar there was no need for the officers of Mercury to bribe the employees of the schools (who were for this purpose representing the interests of the United States) since they themselves operated the schools and saw to it that Mercury received the business. Cf. Pan American Petroleum Co. v. United States, 1927, 273 U.S. 456, 47 S.Ct. 416, 71 L.Ed. 734.

For the reasons stated, we hold that the crime of conspiring to defraud the United States is adequately charged by the present indictment. See also Haas v. Henkel, 1910, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569; United States v. Keitel, 1908, 211 U.S. 370, 29 S.Ct. 123, 53 L.Ed. 230; Heald v. United States, 10 Cir., 1949, 175 F.2d 878, certiorari denied 1949, 338 U.S. 859, 70 S.Ct. 101, 94 L.Ed. 526; Chevillard v. United States, 9 Cir., 1946, 155 F.2d 929; United States v. Gonzales, D.C.D.Mass.1944, 56 F.Supp. 995.

Appellants' second contention is that there was no proof of a criminal conspiracy, specifically that no evidence was submitted to show that the Veterans Administration relied on the cost statements in fixing the tuition rates and that no testimony pointed to any fraudulent increase in school costs.

██ The testimony overwhelmingly showed that the defendants organized Mercury to inflate those costs, that such costs were in fact inflated far beyond what the schools could have and should have paid for the same material elsewhere, and that the administrative heads of the five schools were instructed to place all their orders for supplies and tools through defendant Weinberg. To what extent the Veterans Administration was fooled by this unseen [2] artificial cost mark-up is not clear, nor is it important. The intent to defraud the Government by their actions is plain. That is what they

---

2. Defendant Weinberg at first refused the Veterans Administration permission to examine the books of Mercury.

were indicted for and that is what the Government proved.

We now proceed to the points raised with respect to the conduct of the trial.

■■ Appellants urge that the reading to trial witnesses Shaffer, O'Brien and Yekel of a part of their grand jury testimony was improper. The ground asserted to us. is that there was no foundation laid for this. The actual extent of the preliminary background necessary to support such use of grand jury minutes is within the discretion of the trial judge. In the instances cited to us that discretion was not abused. Nor was there any transgression in his method of handling the disputed testimony. This was a straightforward reading of the requested portions of the grand jury minutes for the legitimate purpose of refreshing the recollection of the witnesses in accordance with the practice approved in United ' States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 232–234, 60 S.Ct. 811, 84 L.Ed. 1129.

Under this topic appellants argue that failure of the judge to directly tell the jury in his charge how they were to regard the grand jury testimony was especially prejudicial in the light of the court's statement that it would instruct the jury on the purposes for which it was received. The court quite evidently overlooked this in its main jury instructions. Immediately following these, appellants' counsel at their request conferred with the court at side bar; they took numerous exceptions, the discussion going on for twelve printed pages of the appendix. Counsel covered everything

they had and said nothing about what they are now complaining. The court then further charged the jury regarding some of the defense thoughts. After that the attorneys for both appellants addressed the court as to ' the supplemental charge and took an additional exception but they made no request of or comment to the court with respect to charging on the purpose of the reading of the grand jury testimony.

■■ Irrespective of the non-action of the attorneys let us see what the omission to so charge amounted to. With respect to Shaffer who agreed with his grand jury testimony it was harmless. O'Brien, the second grand jury witness, stated that before the grand jury he had been asked and had answered all of the questions and answers read to him with the exception of two answers which he did not recall "as such". The failure to cover this in the charge was a minor fault.

There remains the lack of mention in the charge of the Yekel grand jury testimony. This witness had been president of and in charge of Mercury during the critical period. He had been employed by appellant Weinberg for some years prior to that and had continued taking care of the latter's affairs without compensation after he went with Mercury. He was almost the last witness called by the Government in its main case. By that time it had established the conspiracy of the defendants to defraud the United States as outlined in the indictment.[3] The net result of his testimony is that he did not essentially contradict

3. After some preliminary inquiry there were the following questions of Yekel and answers by him on direct examination:
"Q. Now tell me some more about the meeting with Mr. Bird at his office with Mr. Weinberg, that is Mr. Bird's office with Mr. Weinberg. A; Down in Plymouth you mean?
"Q. Yes. A. The only thing I could recall is we went down, I went down with Mr. Weinberg, and Mr. Bird was in his office, we went in and sat down and we talked about Mercury's possibili-

ties in writing to certain companies in mining lines, equipment and supplies, that is all.
"Q. Did you discuss the question of purchasing tools and consumable supplies for schools? A. I don't think we did.
"Q. Did you have any discussion about who your potential customers were? A. No, we never did.
"Q. Did you have any meeting with Mr. Bird and Mr. Weinberg at which you discussed the sale of tools and supplies to the schools operated by Mr. Bird and Mr. Weinberg? A. I didn't, no.

his grand jury evidence. He played with words, he seized any opportunity presented by the questions to restrict his previous answers, he readily distinguished between a meeting and an informal discussion, between the words "mark up" being actually used and the decision to make the schools pay retail

"Q. You are sure you didn't? A. No.

"Q. Did you ever have any discussion with Mr. Bird and Mr. Weinberg with regard to the sale of tools to the schools? A. Not that I could recall.

"Q. And the question of mark up in price from which Mercury bought it and the price you were going to get from the school? A. We never sat down and discussed anything like that.

"Q. You never discussed that? A. No.

"By Mr. Matlack: Under the authority of the Socony Vacuum case I will ask the Court to put the following questions and answers which the witness made to the grand jury."

The motion was granted over objection. The court then read to the witness questions and answers from his grand jury testimony as follows:

" 'Q. Who determined that? A. *Well, at the meeting we determined the prices that we are going to sell for.*'

"Were you asked that question and did you make that answer?

"By the Witness: *I made that answer to the grand jury, but that isn't the question Mr. Matlack just asked me now.*

"By the Court: You made that answer to the grand jury?

"By the Witness: Yes, sir.

"By the Court: 'Q. What was said on that? A. We decided to stick right close to the companies catalogs.

" 'Q. I am not asking you that. I asked you what the discussion was, sir. Who said that we are going to write these prices up to the schools? A. Well, Mr. Weinberg usually had—

" 'Q. Did Mr. Weinberg determine that policy? A. He determined the policy.

" 'Q. He determined the policy? A. Yes.

" 'Q. Was Mr. Bird acquainted with that policy? A. He should have been.

" 'Q. It was discussed at the meetings he was present and you were present? A. Yes.

" 'Q. About the upping of the prices? A. That is right.'

"Were you asked those questions and did you make those answers?

"By the Witness: If I was asked the questions I made the answers. Maybe I wasn't clear at the time I made the answers.

"By the Court: *Did you make those answers?*

"By the Witness: *Yes, I did.*" (Emphasis supplied).

The witness then said the discussion of marking up the price did not happen at a meeting, that "I never *sat down* and discussed marking up prices with them [Weinberg and Bird]." (Emphasis supplied). He said "Mr. Weinberg and I had discussions on the catalogs that we used for equipment that we were selling." He said "I never talked to anybody about marking up prices." The court asked him: "Did you tell the grand jury you did?" The witness answered: "I might have told the grand jury he did. I might have misunderstood the question at the time. I was under pressure up there." A little later he gave the following testimony: "Q. But you did discuss the question of prices with Mr. Weinberg when Mr. Bird was present, is that so? A. He may have been there, I can't say definitely. He was there at different times. Q. At no occasion? A. We never had a *specific* meeting or gathering or anything where we *sat down*, the three of us, and discussed anything about prices or anything. Q. *Informal discussions you mean? A. That is right.*" (Emphasis supplied). Pressed as to who gave those instructions the witness said: "Well, that is the way it was with Mr. Weinberg when I was employed by him." By the Court: "Did anybody instruct you specifically to do it for Mercury?" By the Witness: "Nobody instructed me specifically to do it for Mercury, but, as I said, I worked with Mr. Weinberg and that was our policy." He was asked by the court *"Was there a mark up to the schools more than there was to Scott [a supplier]?"* and he answered "Yes". (Emphasis supplied).

It is clear from Yekel's evidence and from that of Weinberg that the so-called manufacturer's catalog or list price is the retail sales price suggested by the manufacturers to the distributors, material men and suppliers purchasing from them. Weinberg said as to this:

"Q. So that the manufacturers list price was the price at which you sold it, is that correct? A. That is correct.

"Q. *And included a mark up from the price at which you bought it from the manufacturer? A. That is correct, sir."* (Emphasis supplied).

prices for the merchandise sold them by Mercury. But the facts come through and the total effect is a republishing of the story given to the grand jury.

So what we have finally is that although he was declared hostile to the Government there is no real contradiction between his trial admissions relative to former evidence and that evidence. We therefore have no problem of neutralization of evidence and it was not major error to neglect a limiting instruction with regard to the use of the grand jury testimony. See Curtis v. United States, 10 Cir., 1933, 67 F.2d 943; Ellis v. United States, 8 Cir., 1943, 138 F.2d 612, 621.[4]

Appellants also claim that the court failed to instruct on numerous other vital issues concerning which during the course of the trial it had stated it would. Twenty-five references to such alleged instances are given, including the above discussed point re the grand jury testimony. Three others are signalled out in appellants' brief for detailed attention. Two of these involve Louis Shaffer, an attorney, who was named as a conspirator in the indictment but not indicted. He acted for the appellants in organizing the schools involved and the Mercury company. He kept the minute books, attended to the issuance of the stock of the various corporations and performed the duties of secretary of each corporation. He executed and endorsed notes for the Parker Body & Fender School (one of appellants' schools) and for Mercury which were discounted at the Wyoming National Bank in Wilkes-Barre. Shaffer was called as a witness by the Government. He was shown Government exhibit #46, a note of the Parker School by defendant Weinberg, president, and Shaffer, secretary, to the order of Weinberg and Shaffer. He said he endorsed it as a matter of convenience

for a client and named Weinberg as the client. The Government then asked the court to read to the witness certain questions and answers from his grand jury testimony. The court complied under the authority of United States v. Socony-Vacuum Oil Co., supra, which permits the reading of such questions and answers to refresh the recollection of the witness. Shaffer agreed that he had told the grand jury that he was the attorney for the Parker School and represented the undisclosed interest of the witness Bird. Shown Government exhibit #47, a note of Mercury to Weinberg and Shaffer given for a loan of Mercury by the Wyoming Bank, he said he still represented Bird when he endorsed it. At that point the court said it would instruct regarding Shaffer's testimony as to Weinberg and Bird and "* * * whether or not one is bound by the other". In his charge the trial judge said, "The act of one partner in crime is admissible against the others where it is in furtherance of the criminal undertaking. All such responsibility of one for the other ends when the conspiracy ends." The court could have pointed more emphatically at the particular Shaffer testimony but beyond doubt it covered the court's earlier statement.

The second Shaffer incident arose from the following defense cross-examination question asked of Shaffer: "Mr. Shaffer, in all of the dealings with Alfred Lee Weinberg and Morgan Bird, Sr., did Alfred Lee Weinberg and Morgan Bird, Sr., unlawfully conspire, confederate and agree with you, named as a co-conspirator in this indictment to defraud the United States out of certain monies by fraudulently inflating the cost basis of the tuition rate and by fraudulently inflating and increasing the cost to be charged to the Veterans Administration of furnishing to the said veterans the books, supplies, and equipment neces-

---

4. Appellants maintain that they should have been permitted to examine all of the evidence given by the three witnesses to the grand jury. The court offered to give them that part which had been read to the witnesses and the offer was declined. Under the trial circumstances there was no substantial error in that ruling. See United States v. Socony-Vacuum Oil Co., supra.

sary for the satisfactory pursuit and completion of the courses of education and training in which they were enrolled?" The question was objected to as calling for an improper conclusion which it palpably did. In sustaining the objection the judge told the jury that "* * * there have been questions here as to confidential relationships between lawyers and clients. There are certain times when that relationship ends. There are certain times when that privilege is not present. We will instruct you appropriately at a later time in this proceeding." Manifestly the court's remarks had no immediate allusion to the erroneous question but related to the earlier defense objection to Shaffer testifying at all. That had been the subject of extensive discussion at that time and the objection had been actually overruled.[5]

The third occurrence concerns Bird's objection to the reading of Weinberg's testimony before the grand jury. This too, though not precisely identified, was embraced within the court's charge language above quoted in connection with the first Shaffer episode.

We have checked out the remaining twenty-one references. These are inconsequential with most of them generally within the court's charge.

Appellants also assign reversible error to that part of the charge reading "May I say to you in this case that there are two defendants. You can not convict one and acquit the other. You must either acquit the two or none at all, or convict the two or none at all. In other words, one person alone can not commit conspiracy."

The court's theory on this was that the testimony did not show participation in the conspiracy by any person other than the defendants; therefore that the naming of the other three as co-conspirators was a nullity. Even assuming the

trial judge was in error in this part of his charge it was a mistake favorable to the defense. Appellants contend in their brief that "* * * the jury may well have concluded that the prosecution had proven a conspiracy by only one of the named defendants with the other three named in the indictment, but not indicted nor made defendants. The jury, however, could not assert such a conclusion in the face of the trial judge's charge that they could not convict the one without convicting the other." Appellants overlook that the judge charged the jury in words that could not be misunderstood:

"You cannot find the defendants guilty as charged in this indictment unless the evidence satisfies you and each and every one of you beyond a reasonable doubt that every element of the offense specified in the statute upon which such indictment is based has been proved. If there remains any such reasonable doubt as to any such element in the mind of any one of you, there can be no conviction of the defendants upon such count.

"If the Government has satisfied you beyond a reasonable doubt of the truth of what it sets out in the indictment, then your verdict should be guilty. Otherwise, your verdict should be not guilty. The burden of proof rests upon the Government to prove beyond a reasonable doubt every substantive fact necessary to be proved in order to convict the defendants of any crime under this indictment. If the Government fails to do so, the defendants should be acquitted."

And later told the jury:

"Whatever your convictions are before your God and your flag, vote them. Don't be swayed by prejudice for or against the Government, or for or against the defendants, but call them as you see them. That is

---

5. In Clark v. United States, 1933, 289 U.S. 1, 15, 53 S.Ct. 465, 470, 77 L.Ed. 993, Mr. Justice Cardozo held under facts akin to those before us that "The

attorney may be innocent, and still the guilty client must let the truth come out." And see infra under detailed discussion of the Shaffer testimony.

the American custom—as you see them, the truth, nothing but the truth, so help you God."

And that later in the same paragraph of the charge as the language quoted by appellants the court said:

"*If you believe from the evidence in this case that one of the defendants was guilty of certain misconduct, criminal conduct, and the other wasn't, there is no conspiracy.*" (Emphasis supplied).

The court in its charge confined the crime of the defendants to conspiring with each other. Conspiracy by either defendant with any of the other three persons named as conspirators in the indictment was eliminated. And then the court added that even if the jury found one defendant guilty as charged, if the second defendant was found, under the charge, not proven guilty beyond a reasonable doubt, the jury was bound to acquit the guilty one because of the court's premise that in such circumstances there had been no conspiracy shown. All this affirmatively lightened the defense task. It was not reversible error. Cf. United States v. McCann, 2 Cir., 1929, 32 F.2d 540, 542, certiorari denied Whitaker v. U. S., 1929, 280 U.S. 559, 50 S.Ct. 18, 74 L.Ed. 614.

Still attacking the charge appellants say that the Government case was unduly emphasized and that the court failed to adequately review the law of the evidence. In this long trial the Government evidence, testimonial and documentary, was far more voluminous than the defense. The judge did review the evidence and of necessity spent more time on that of the prosecution but we fail to see that substantial unfairness to the defense resulted. We have already quoted his strong instructions to the jury in giving that body its fundamental decisional guides. Towards the end of his charge he stressed the necessity of a judge being impartial and said, "*We have no opinion that is not our department.*" (Emphasis supplied).

With the benefit of only three requests by the defense, and none from all that appears by the prosecution, the court gave the jury a rather thorough charge. It runs forty-five printed pages. It included the elements necessary for the jury to decide the case under their oaths.

Appellants assert that Shaffer's evidence was privileged and should have been excluded. Contrary to their premise we think that prior to Shaffer testifying the Government had made a prima facie showing of conspiracy between the two defendants. Therefore the decision in United States v. Bob, 2 Cir., 1939, 106 F.2d 37, 40, 125 A.L.R. 502, certiorari denied 1939, 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493, is very much in point. The court there held, and it is sound law, that an attorney's testimony which related to conversations and communications with his client during the commission and in furtherance of the crime charged in the indictment is not privileged. See also Clark v. United States, 1933, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993; In re Selser, 1954, 15 N.J. 393, 105 A.2d 395; Note, 24 Fordham L.Rev. 290 (1955).

Part of the testimony of the Federal Bureau of Investigation accountant is the subject of the next point. The witness had examined the books and records of the schools and of the Mercury company. He testified as to the results, including the facts that Mercury and the schools had not purchased sufficient tools to furnish the veterans full sets and that the rent for the Lee School was overstated in its cost statement. We are satisfied that while these might well be independent crimes as appellants suggest they were not unrelated to but an integral part of the overall picture of fraud developed by the Government and evidence as to them was admissible. See Leeby v. United States, 8 Cir., 1951, 192 F.2d 331, 335; Green v. United States, 1 Cir., 1949, 176 F.2d 541.

In an attempt to counteract the tool deficiency evidence certain alleged

receipts of veteran students were offered by the defense under the Federal Shop Book Rule, 28 U.S.C. § 1732. The court refused to permit them. The defense effort was to contradict their own books of Mercury and the schools involved. Northeast and Parker. There had been evidence strongly pointing to tampering with a like receipt or receipts. The books and records of Mercury and the two schools from which the Government accountant had obtained his data were in the courtroom and subject to the defense examination. The judge in effect rejected the receipts as not complying with the intent of the statute, i. e., powerful motive to misrepresent was present together with evidence tending to indicate misrepresentation. See 5 Wigmore on Evidence, § 1527 (3rd ed. 1940). The court did allow Weinberg to testify of his own knowledge that he knew the required number of tools was furnished. If there was error at all in the ruling we cannot say that it was serious. See McKee v. Jamestown Baking Co., 3 Cir., 1952, 198 F.2d 551, 556.

■ There is objection by appellants to the exclusion of evidence of three Veterans Administration employees offered to show that Weinberg had no intention of defrauding the United States in forming Mercury or in charging the schools the prices of which the Government complained. Weinberg had been permitted to tell about conversations he had had with Veterans Administration contract officers and others and that they had told him that purchasing from Mercury was satisfactory provided the contract price was not exceeded. Campion, one of the employees offered, would have testified that it was "very possible" Weinberg told him about Mercury. Weinberg himself said he had *not* told Campion "all about Mercury." Of course in this setting Campion with incomplete knowledge could not be used as an opinion witness. What Weinberg said he told Campion was not challenged by the Government. So the harm, if any, in not having Campion testify that it might have happened was slight. In addition, if Campion had so testified and the judge had charged that the jury could consider that testimony, in connection with all the other evidence on the subject and under the rules laid down, on the question of Weinberg's intent, the court would also have been forced to charge that the jury should also have in mind the circumstance that Weinberg had failed to advise Campion fully of his relationship to Mercury and of that concern's complete dealings with the schools.

■ The second witness was to show that the Veterans Administration functioned by information other than cost statements in determining tuition rates. That evidence was of no help in corroborating Weinberg's innocent motivation.[6] The last proffered witness would have testified about the Administration at one time withholding payments to the schools because they purchased tools from a company in which the stockholders of the schools had an interest but later resuming such payments after an examination disclosed no legal reason why the funds should be withheld. Those incidents occurred more than a year after the defendants had started their schools. Evidence regarding them had no important bearing, if any, on the question of Weinberg's intent. Cf. Smith v. United States, 9 Cir., 1951, 188 F.2d 969, 970–971. We find no substantial error in the barring of the testimony of these witnesses.

Finally, appellants assert that they were not given a fair trial.

They say that defense counsel were repeatedly and unnecessarily interrupted and argued with by the court; that the court made prejudicial remarks and prejudicial rulings on evidence.

---

**6.** There was no assertion in the offer that the defendants were informed of this at the time of their alleged conspiracy. See Iva Ikuko Toguri D'Aquino v. United States, 9 Cir., 1951, 192 F.2d 338, 363, certiorari denied 1952, 343 U.S. 935, 72 S.Ct. 772, 96 L.Ed. 1343.

The judge in his charge stated that "there were occasions when we had to stop Mr. Matlack [Government counsel], when we had to stop our friend Mr. Levy [defense counsel], when we had to stop Mr. Rosenn [defense counsel] and when we had to stop Mr. White [defense counsel]." It was in that connection that he stressed the necessity of a judge to be impartial and the fact that he had been and concluded by saying "We have no opinion, that is not our department."

On the whole record we cannot conscientiously hold that the conduct of the district judge resulted in an unfair trial to these appellants. Counsel had decided views and expressed them as did the court. The judge was there to see to it that the trial proceeded and was kept within its reasonable legal boundaries. It was a difficult tedious proceeding over which we think the district judge presided without committing substantial error.

The judgment of the district court will be affirmed.