Francis L. HARNEY, Jr., Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Charles H. LAWTON, Jr., Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

James S. O'CONNELL, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 5956–5958.

United States Court of Appeals First Circuit.

July 18, 1962.

Stanley H. Rudman, Boston, Mass., for appellant in No. 5956.

John M. Russell, Boston, Mass., with whom Lawrence R. Cohen, Boston, Mass., was on brief, for appellant in No. 5957.

C. Keefe Hurley, Boston, Mass., with whom Earle C. Cooley, Boston, Mass., was on the brief, for appellant in No. 5958.

Paul A. M. Hunt, Asst. U. S. Atty., with whom W. Arthur Garrity, Jr., U. S. Atty., and Joseph F. Gargan and John J. Curtin, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

The appellants were indicted by a grand jury in the court below for conspiracy to defraud the United States in violation of Title 18 U.S.C. § 371 quoted in the margin.[1] The indictment charged that the appellants with five others, Walter M. Webb, Felix J. Myette, Erroll G. Hopkins, Ernest T. Collins and Joseph L. Schwartz, who were named as conspira-

tors but not as defendants, conspired to defraud the United States, particularly the Bureau of Public Roads of the Department of Commerce. The allegations are that the defendants-appellants, knowing that under the Federal Aid Road Act, 23 U.S.C. § 101 et seq., the Commonwealth of Massachusetts would apply for and receive from the United States through the Bureau of Public Roads payments in partial reimbursement for damages paid for lands taken for federal highway purposes " * * * did combine, conspire, confederate, and agree" among themselves and with the co-conspirators named but not charged in the indictment "(a) to hamper, hinder, obstruct, and impede the lawful functions, operations and purposes of said Bureau of Public Roads of the Department of Commerce in the administration of the Federal Aid Highway program by impeding and preventing by craft, trickery and deceit a fair, honest, and disinterested valuation and negotiation of damages resulting from the taking by the Commonwealth of the real property owned by Damort Land Corporation; (b) to divert or cause to be diverted to the personal use, gain and benefit of one or more of the defendants and co-conspirators a large portion of the money paid by the Commonwealth to Damort Land Corporation in payment for the real estate taken from said corporation, the share of said payment reimbursable by said agency of the United States being ninety per cent, contrary to and in derogation of the purpose and intent of the Commonwealth in making the said payment and contrary to and in derogation of the purposes and intent of the Federal Aid Highway program and (c) to cause the Commonwealth to pay to Damort Land Corporation in payment for the real estate taken from said corporation an amount of money far in excess of the sum which the said owner

---

1. "§ 371. Conspiracy to commit offense or to defraud United States

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for

any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

demanded and was willing to receive in full payment of its claim, all in violation of Title 18, United States Code, section 371."

On arraignment the defendants pleaded not guilty and soon thereafter the defendants severally filed motions to dismiss, motions to strike portions of the indictment and motions for a bill of particulars. The motions were denied after hearing, further motions to dismiss or in the alternative to continue the trial grounded upon alleged extensive adverse publicity were also denied, and the defendants were set to the bar to be tried by jury. Motions to dismiss and for judgment of acquittal made at the conclusion of government counsel's opening statement to the jury were denied and motions for judgment of acquittal made at the conclusion of the government's evidence were also denied. Electing to introduce no evidence in their own behalf the defendants moved again for judgments of acquittal, and moved to strike portions of the indictment and all evidence admitted *de bene*. The court allowed the motions to strike as to paragraph 13 of the indictment insofar as it alleged that the land had been purchased by Damort on February 8, 1956, for $20,000, and as to the second overt act alleged, but otherwise denied the motions and, denying some of the defendants' requests for instructions, submitted the case to the jury. The jury returned verdicts of guilty as to each defendant and thereafter the court, denying motions in arrest of judgment, motions for judgments of acquittal notwithstanding the verdicts or in the alternative for a new trial, passed the judgments of sentence from which these appeals have been taken.

The appellants charge the court below with numerous errors. Their general attack, however, boils down to six fundamental issues. These are whether the indictment alleges facts constituting an offense against the United States, whether the evidence introduced by the government supports the charges laid in the indictment, whether prejudicial pre-trial publicity deprived the appellants of a fair trial, whether the court erred in refusing to direct production by the government under the Jencks Act, Title 18 U.S.C. § 3500, of a report of a subcommittee of the Public Works Committee of the United States House of Representatives known as the "Blatnik Committee," whether the court erred in the admission of certain testimony, particularly that of one Beasley, an expert appraiser called by the government, and whether it was error for the court below to have denied certain requests for instruction.

Our first concern is whether paragraph 16 of the indictment, quoted from at length above, charges an offense against the United States. That paragraph in substance charges the appellants with unlawfully conspiring among themselves and with five others (a) to impede the lawful functions of the federal Bureau of Public Roads by fraudulently preventing a fair and disinterested valuation and negotiation of the damages resulting from the taking of land of the Damort Land Corporation by the Commonwealth of Massachusetts for a link in a Federal Aid Highway, (b) to divert to private use by the conspirators a portion of the money paid by the Commonwealth to Damort for its land, and (c) to cause the Commonwealth to pay an amount for the land far in excess of what the owner was willing to accept in full payment of its claim.

■ ■ It is now beyond the shadow of doubt that aiding the states in the construction of interstate highways is a lawful function of the United States government. The question of federal power in this regard was said to be settled beyond question years ago in State of California v. Central Pacific Railroad Co., 127 U.S. 1, 39, 8 S.Ct. 1073, 32 L.Ed. 150 (1888). And in the leading case of Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924), Mr. Chief Justice Taft wrote for a unanimous Court:

"To conspire to defraud the United States means primarily to cheat the

Government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane or the overreaching of those charged with carrying out the governmental intention."

█ Under this two-pronged interpretation of the statute paragraph 16 of the indictment to which we have referred certainly alleges an offense under the conspiracy statute, for, as will presently appear in detail in our discussion of the evidence, cheating or overreaching the Commonwealth with respect to the amount it paid for land taken by it for federal highway purposes would in the end expend itself upon the federal government to the extent of 90% under the federal aid road act thereby obstructing one of its lawful functions and if successful subjecting it to pecuniary loss by causing it to pay more than it needed to for the land. The legal sufficiency of the indictment is so clear as not to require further discussion. See, however, Green v. United States, 28 F.2d 965 (C.A.8, 1928); Langer v. United States, 76 F.2d 817 (C.A.8, 1935), and United States v. Weinberg, 226 F.2d 161 (C.A. 3, 1955), cert. denied, 350 U.S. 933, 76 S.Ct. 305 100 L.Ed. 815 (1956), for comparable situations in which indictments under the present conspiracy statute, or its substantially similar predecessor, were sustained. And see also Curley v. United States, 130 F. 1 (C.A.1, 1904), cert. denied, 195 U.S. 628, 25 S.Ct. 787, 49 L.Ed. 351 (1904).

We come now to the question whether the evidence supports the charges laid in the indictment and the jury's verdicts of guilty as to each defendant.

In the light most favorable to the government the evidence can be stated as follows:

Prior to the time with which we are concerned, co-conspirator Walter M. Webb was the president, treasurer and sole stockholder of Damort Land Corporation, which owned an irregularly shaped tract of land consisting of 32,500 square feet with a large frame warehouse, a two story frame building, a spur track and a chain link fence on it in Attleborough, Massachusetts. The land lay unused and Webb had listed it with C. H. Lawton Co., a real estate firm in Pawtucket, Rhode Island, for sale. No buyer had been found, but the frame building had once been leased for a time to a concern in the dairy business.

Early in 1959 co-conspirator Myette, an employee of the Lawton real estate firm, attended a public hearing in Attleborough at which he learned that the Damort, or Webb, land, or a substantial part of it, would be taken by the Commonwealth for the construction of a link of Interstate Route 95, a highway under construction in sections under the Federal-Aid Highways Act, which, when completed, would extend from northern Maine to Miami, Florida. Myette telephoned this information to Webb and suggested that the latter take the Damort property off the market because in his opinion the Commonwealth would prove to be the best buyer. Webb agreed and removed the property from the market. Later in 1959, probably in May, the defendant Harney, a right of way negotiator employed by the Massachusetts Department of Public Works who had been assigned to do preliminary work with respect to the taking of the Damort property, called Myette on the telephone as a result of which the two met and inspected the property. Harney asked Myette if the property belonged to Damort Land Corporation and if his firm was Damort's agent for the sale of the land. Receiving an affirmative reply to the first question and a reply to the second that the Lawton firm had handled the rental of the property, the two carefully examined the land.

Soon thereafter Harney telephoned Myette again and asked the latter to visit

the property with him a second time. They met again on the property, this time with the defendant Lawton also, and on that occasion Harney said that the Commonwealth was going to take the land, and "In cases like this oftentimes it is better if the owner had some representation in Boston." Myette said he thought that "was probably the thing to do" and Harney recommended the defendant O'Connell as "a man who could help in getting as much money as possible for the land" saying, according to Myette's testimony, that O'Connell was a lawyer in Boston and had, Myette thought Harney said, "a brother in the Governor's office or something like that and he could make the way clear and easy for the sale of the property."

Myette reported this conversation to Webb who asked what Myette thought. Myette told Webb that he thought it was "all right, because it is being done and has been done" and Webb told Myette: "You go ahead; I haven't got time to bother with it, you go ahead and handle it."

At about this time Harney called Webb on the telephone and asked him what he wanted for the Damort land. Webb replied that he wanted $30,000 and Harney then said: "If I get you $35,000, is that all right?" to which Webb answered: "O.K."

Soon after this conversation Lawton and Myette, pursuant to a telephone appointment, called on O'Connell in his Boston office. When they arrived Harney was there and after passing the time of day Myette asked O'Connell if he would represent Webb with respect to the taking of the Damort land. O'Connell replied that he would if Webb would send him a letter of authorization and Myette and Lawton then left, leaving Harney behind.

Myette gave Webb a report of the meeting over the telephone and on June 15, 1959, Webb by letter authorized the defendant Lawton to represent him in eminent domain proceedings with respect to the Damort land. Lawton then engaged O'Connell as legal counsel to handle

the matter with the Massachusetts authorities and O'Connell entered his appearance for Damort with the appropriate Commonwealth officer.

On August 10, 1959, the Commonwealth officially took 29,500 square feet of the land as Parcels 105, 105a and 105b of Layout 4877 for completing a link in Interstate Route 95 by filing an order of taking in the Registry. The legality of the taking procedure is not questioned.

In the meantime Webb had called Myette several times on the telephone to inquire about O'Connell's progress and finally Myette and Lawton went to O'Connell's office by appointment. When they arrived Harney was there and O'Connell told them that he was making progress but these things take time. But he said he thought the matter would soon be concluded. Again Myette and Lawton left, leaving Harney behind.

Early in the fall "a man by the name of Mr. Potter" (not otherwise identified but apparently an employee of the Massachusetts Department of Public Works) appraised the damages to result to Damort from the taking of its land at $35,000, which appraisal was approved by one Thompson, also of the Massachusetts Department of Public Works. Potter's appraisal was described as a "windshield appraisal" meaning by that, we assume, a casual one made without a detailed study of the land or a full analysis of the elements bearing upon its value.

Every two or three weeks during the fall Webb visited O'Connell's office or called him on the telephone to inquire about progress. In mid-November co-conspirator Hopkins, a right of way negotiator for the Department of Public Works assigned to make a second departmental appraisal of the property, called Webb on the telephone to ask for keys and to make some inquiries about the land which Webb answered. Webb reported his call from Hopkins to O'Connell and at a later meeting in O'Connell's office, at which Harney was present, Webb asked about Hopkins and was told that "he was straightened out—taken care

of." Hopkins later submitted an appraisal of $54,000 for the land.

In the meantime co-conspirators Collins and Schwartz had been appointed by some Commonwealth official in the Department of Public Works in substitution for two others, it does not appear who made the substitution, to appraise the Damort property as "outside" or "fee" appraisers, that is, appraisers outside the Department called upon for a fee to appraise special parcels taken by the Commonwealth.

Collins submitted an appraisal of $65,000 for the land on December 28, 1959, and on the same date Schwartz submitted an appraisal of $67,000. The Real Estate Review Board of the Department after considering these appraisals sent the Damort land matter back for another fee appraisal and the defendant Lawton was appointed as a third outside appraiser. He submitted an appraisal of $60,000 for the land in February 1960 and with it a certificate under oath that he had no interest in the land present or prospective and never had had any interest in it.

On the basis of the appraisals of Hopkins, Collins, Schwartz and Lawton the departmental Real Estate Review Board fixed the maximum figure for out-of-court settlement for the Damort land at $60,000 and sent Webb an agreement for settlement at that figure plus $212.03 for taxes. This gave Webb his first knowledge of the price the Commonwealth would pay for the land. Webb signed the agreement for settlement on March 1, 1960. The award of $60,212.03 was apportioned as follows: Damort Land Corporation c/o James S. O'Connell, Esquire, $47,383.37, City of Attleborough for taxes $558.69 and Rhode Island Hospital Trust Co., mortgagee, $12,269.97.

On April 1, 1960, Myette read in a newspaper that the Commonwealth had settled for the Damort property, and called Webb to tell him so. Webb replied that he had not yet received any money to which Myette said he replied: "Well, when you do I'd like to—you know. I'm a little bit short. I'd like to have some money." Myette said that actually Webb "didn't owe us a quarter" because they had not sold the property but that he thought Webb ought to pay something for the advice and service they had rendered. On April 21, 1960, Webb sent C. H. Lawton & Son a check for $1,500 which he said he calculated as 5% commission for the sale of the land at $30,000.[2] Myette and the Lawton Company divided the amount of the check equally between them.

On April 4, 1960, Webb by appointment met with Harney at O'Connell's office. At that time O'Connell had a check from the Commonwealth payable to "Damort Land Corp." dated March 31, 1960, in the amount of $47,383.37, i. e. the difference between the gross award of $60,212.03 and the amount, $12,828.66, due the Rhode Island Hospital Trust Co. on its mortgage. Webb endorsed the check and, demanding a receipt, left it with O'Connell. On this occasion Webb asked how the final price had been arranged and Harney told him that three appraisals had been obtained for $67,000, $64,000 and $57,000 and that when a fourth was required Lawton had made one for $60,000. When Webb asked what he should do if any one asked him questions about the land, he was advised to say that it was worth $60,000, that he had met O'Connell prior to the transaction, and that it would not be "wise" to indicate that he had met Harney in O'Connell's office.

A few days later at O'Connell's office Webb was handed a check drawn by O'Connell on his client's account for $17,383.37 [3] payable to Damort Land

2. Webb indicated on the stub of the check that it was drawn as 5% commission on $30,000 and C. H. Lawton Co. billed Webb for a $1,500 "commission." This bill was later destroyed and another substituted "for services."

3. Gross settlement $60,212.03 minus $12,828.66 due on the mortgage less $30,000

Corp. as his share of the settlement. Webb photostated the check before he cashed it.

Webb admitted that he had never made any fee arrangement with O'Connell and that he was never billed by O'Connell for a fee. He said that he understood that he was to get what he wanted for the property, that is to say $30,000, and that O'Connell would get any excess over that amount.

During the summer of 1960 agents of the Federal Bureau of Investigation and representatives of the so-called Blatnik Committee of the United States House of Representatives initiated investigations of land takings for federally aided highways in Massachusetts. These investigations had extensive publicity and included investigations of the taking of the Damort property in the course of which Webb was interviewed several times both by agents of the FBI and by agents of the Blatnik Committee. Evidently these investigations caused the alleged conspirators some concern for in August, or perhaps even a month or two earlier, Myette and Lawton met with Webb at his office in Boston and matching the Webb and Lawton files removed and destroyed all letters or other papers having any reference to a $30,000 valuation of the Damort land including Lawton's bill to Webb for $1,500 "commission."

■ ■ We have stated the Government's evidence at length, not to weigh its credibility, that is the jury's function, but to demonstrate its legal sufficiency to support the charge laid in the indictment and the verdicts of guilty as charged. But in performing our function we do not necessarily have to look for direct evidence of a conspiracy for: "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'" Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct.

457, 86 L.Ed. 680 (1942), citing and quoting Mr. Justice Sutherland in United States v. Manton, 107 F.2d 834, 839 (C.A. 2, 1938), cert. denied, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940).

■ From the various meetings of the alleged conspirators it can readily be inferred that they were engaged in the formulation and execution of a common purpose or plan of action with respect to the taking of the Damort land. And what that common plan or purpose was is clear enough to warrant the verdicts of the jury. It was to get for Webb what he wanted for the Damort land and to pocket the balance. Whether the $30,000 over and above what Webb wanted for the land remained in O'Connell's hands or was later distributed by him makes no difference. It is enough that the jury could reasonably find that by means of the plan the Commonwealth was hoodwinked into paying more for the land than the land owner was willing to accept and that the excess found its way, in the first instance at least, into the pocket of one of the conspirators. And as will presently appear, this is enough to sustain the charge of interference with a lawful function of the United States as well as the Commonwealth of Massachusetts.

The appellants, however, contend that the evidence is fatally deficient in two respects. The asserted deficiencies are lack of evidence that the Commonwealth in fact paid more than the fair value of the land and lack of evidence of a sufficient interest of the United States in the taking to warrant indictment and conviction of the appellants for conspiracy to defraud the United States. We reject both contentions.

■ It is, of course, the constitutional duty of the United States to pay fair value for any land it takes for public purposes. But this does not prevent a land owner from giving his land to the United States in whole or in part. Nor

remaining in O'Connell's hands. Or, the amount of the Commonwealth's check payable to Damort Land Corporation delivered to O'Connell, $47,383.37, minus $30,000.

does it prevent the United States from making an advantageous bargain with a land owner provided, of course, that it does so in a fair, honest and above board transaction. The question is not the fair value of the land. It is whether by chicane the Commonwealth was beguiled into paying more for the land than the land owner acting as a free agent fully able to protect himself (from his testimony it would appear that he is an experienced and competent business man who was fully aware of what he was doing) was willing to accept. See United States v. Weinberg, 226 F.2d 161, 167 (C.A.3, 1955), cert. denied, 350 U.S. 933, 76 S.Ct. 305, 100 L.Ed. 815 (1956). And see also Green v. United States, 28 F.2d 965 (C.A.8, 1928).

In answering the appellants' other contention it is not necessary to undertake a detailed analysis of the Federal-Aid Highways Act, 72 Stat. 885 (1958), Title 23 U.S.C. § 101 et seq., as it stood at the time involved and the administrative procedures under it. It will suffice to say that under the Act and the regulations the highway department of any state desiring to avail itself of federal aid for its highways first submits to the Secretary of Commerce a program of projects for which federal funds previously apportioned to the state by the Secretary are desired, and upon program approval, the state as soon as practicable submits for approval by the Secretary "such surveys, plans, specifications, and estimates for each proposed project * * * as the Secretary may require." § 106(a). When the Secretary has approved a project as conforming to statutory standards, funds out of those he has previously apportioned to the state are administratively set aside for the project, the state is authorized to proceed with the project and the Secretary's " * * * approval of any such project shall be deemed a contractual obligation of the Federal Government for the payment of its proportional contribution thereto." § 106(a).

In the case at bar this stage was reached at least by April or May 1959, for on September 19, 1958, the Bureau of Public Roads reserved $4,000,000 on its books for the link in Interstate Route 95 from the Rhode Island-Massachusetts line to North Attleborough with which we are concerned, on April 10, 1959, the Chief Engineer of the Massachusetts Department of Public Works submitted plans for the acquisition of right of way for the project, referring to a report and certification of a public hearing, and an estimate of right of way costs of $2,610,000 to the Bureau of Public Roads and on May 8, the Division Engineer of the federal Bureau approved the project and authorized the Commonwealth Department "to proceed with the acquisition of right-of-way."

■■ This is by no means a detailed statement of the procedures under the statute. But it is enough to show the close relationship between the state and federal governments in the construction of federally aided interstate highway systems. And it is also enough to show that by the time with which we are here concerned the project for which the Damort land was acquired was more than a hope. At the time of the taking, indeed for some time before, federal participation in the construction of the Rhode Island-Attleborough link was not a mere vague possibility for some time in the future but an immediate practical reality with federal funds set aside to pay for the right of way required. It is, of course, not necessary to show that federal funds were actually paid to the Commonwealth in 90% reimbursement for its taking of the Damort land. Conspiracy is a crime even though the contemplated offense may never be consummated. It is enough to show a scheme whereby through fraud federal funds in normal course would be diverted from their true and lawful object. That has been shown, for the thrust of the fraudulent scheme alleged and proved to the jury's satisfaction · was directed against and would expend itself on the federal fisc. See McGunnigal v. United States, 151 F.2d 162 (C.A.1, 1945), cert. denied, 326 U.S. 776, 66 S.Ct. 267, 90 L. Ed. 469 (1945).

■ We come now to the question whether extensive adverse publicity deprived the appellants of a fair trial or at least required the court below in the sound exercise of its discretion to grant a continuance.[4]

No doubt extensive publicity attended the investigations by the FBI and the Blatnik Committee of the scandals attendant upon the taking of lands in Massachusetts for federally aided highway purposes. But granting all the appellants say as to the scope and intensity of the pre-trial publicity, the situation disclosed falls far short of that considered by this court in the Delaney case cited in footnote 4 above. Moreover, it even falls short of the publicity we considered in Geagan v. Gavin, 292 F.2d 244 (C.A.1, 1961), cert. denied, 370 U.S. 903, 82 S.Ct. 1247 rehearing denied, 82 S.Ct. 1578, 1962, in which we held that in spite of the pre-trial publicity shown, the jurors fully met the constitutional test for impartiality laid down in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Moreover the publicity alleged in this case is not as violent or vitriolic as that reviewed by the Court in Beck v. State of Washington, 369 U.S. 541, 82 S.Ct. 955 (1962).

■ We shall not undertake to describe the publicity said to have fatally infected the fairness of the trial or at least to have required continuance. It will be enough to say that an examination of the record discloses that in this case as in Geagan v. Gavin the court below carefully screened each petit juror on *voir dire* for bias and prejudice engendered by the publicity and carefully cautioned the jurors not to read newspaper accounts or listen to radio reports of the trial during its progress. Enough was done to assure a fair trial. For as the late Judge Learned Hand said in United States v. Dennis, 183 F.2d 201, 226 (C.A. 2, 1950), affirmed, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951):

"Certainly we must spare no effort to secure an impartial panel; but those who may have in fact committed a crime cannot secure immunity because it is possible that the jurors who try them may not be exempt from the general feelings prevalent in the society in which they live; we must do as best we can with the means we have."

Now we come to questions of the admission and exclusion of evidence. We shall consider only a few of the many questions in this category which have been raised, rejecting others as too insubstantial to warrant discussion.

The first question for consideration is whether a certain report of the Blatnik Committee is producible under the Jencks Act, 18 U.S.C. § 3500.

Webb testified on cross-examination that twice during the fall of 1960 he was interviewed by agents of the FBI and that in the first half of 1961 he was interviewed some six or eight times by representatives of the Blatnik Committee. Counsel for the defendant demanded and were given the reports of the FBI and then they demanded the reports of the Blatnik Committee. In response to this demand counsel for the United States at the bench said that the Blatnik Committee made no such report as that demanded but there was a three page summary. But the government's counsel said that they believed an examination of the document by the court under the Jencks rule would show that it was not the kind of "statement" required to be produced because it was only an unsigned "compilation" of the interviews of wit-

4. The appellants' contention that the indictment should be dismissed because of hostile publicity was answered by this court in Delaney v. United States, 199 F.2d 107, 112 (C.A.1, 1952), wherein we said:

"Nor could it be said, in this case, if indeed it could be said in any case, as a matter of law, that the prejudicial effect of this publicity was so permanent, and ineradicable by mere lapse of time, that the court should have recognized the impossibility of a fair trial ever being held at any time within the foreseeable future."

nesses. The report was then handed to and examined by the court which then said to counsel for the defendants: "I will deny your request. You can mark it for identification if you wish, but I will not allow you to see it." The report was then marked as an exhibit for identification and impounded by the court.

■ An examination of the exhibit clearly shows that it is not a "statement" of the witness, Webb, within the definition of subsection (e) of the Jencks Act. It is only an unsigned summary of the evidence, some of it attributed to Webb, prepared by someone, we know not whom, bearing upon the taking. It is a statement of the facts obviously drawn from a variety of sources roughly comparable to the statement of facts embodied in this opinion.

■ Moreover, counsel for the defendants did not make out a *prima facie* case of entitlement to the report thereby requiring the court under Campbell v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961), to hold a preliminary hearing to determine its producibility by showing through Webb that committee representatives had taken down what Webb said by mechanical or equivalent means or that they had written down what he said and he by signature or its equivalent had approved what the investigators wrote down. In short, the report is not producible as a "statement" under the Jencks Act and there is no evidence to warrant a preliminary hearing to determine its producibility.

■ ■ The third question for consideration in this category can be answered briefly. Evidence of the declarations of one conspirator not made in the presence of all were admitted *de bene* under appropriate instructions that the jury were not to consider such declarations as binding upon a conspirator not present until it was satisfied from other evidence that the conspiracy alleged in fact existed, and that the absent one implicated in the declaration was involved in the conspiracy. This was not error. Lutwak v. United States, 344 U.S. 604,

619, 73 S.Ct. 481, 97 L.Ed. 593 (1953). Nor was there error in admitting evidence of the *act* of destroying Lawton's original bill to Webb for "commission" and the substitution of a bill for services even though the *act* took place after the conspiracy alleged had terminated. Lutwak v. United States, supra at 617, 618, 73 S.Ct. 489. The same is true with respect to the evidence of the destruction of correspondence reflecting a valuation of $30,000.

The only remaining question in this group which we shall consider is the admissibility of a portion of the testimony of the government's expert appraiser, one Beasley. He testified over general objection that the Collins and Schwartz appraisals contained an identical error with respect to the grantor and the area of a parcel of land in Attleborough which both had listed in their appraisal reports as a sale of land comparable to that taken from Damort. The reports of both appraisers listed as comparable a sale by Whitman's Diner, Incorporated, to Almac's Incorporated, of 48,224 square feet of land whereas, as Beasley said, his personal examination of the records in the Registry showed that the grantor was John Bellegris and that the parcel conveyed consisted of 120,724 square feet.

■ Technically, introduction of Beasley's oral testimony as to what he had seen in the records in the Registry violated the "best evidence," or perhaps more accurately the "original document," rule which requires that the contents of a document must be proved by introduction of the document itself. The rule rests upon a policy of precision, it being considered better to present a document to a court rather than to incur the risk of fallibility of human memory or the risk of error in human copying. But oral testimony of the contents of a written document is not inadmissible *per se*, for under a well recognized exception to the rule such testimony is admissible when it is satisfactorily established that the original document is unavailable, as by loss or destruction. Thus Beasley's oral testimony would have been admis-

**534**

sible had it been shown that the Registry had burned down and the original deed had been lost.

There was no such showing in the case at bar. But none was called for by the appellants' general objection nor did that objection alert counsel for the government to the necessity for producing the original deed, or a certified copy thereof, or showing its unavailability, in order to obviate the objection, which we may assume could readily have been done at the trial thereby avoiding another trial to correct the error.

 It is true that the generally salutary rule of the common law embodied in Rule 51 of the Federal Rules of Criminal Procedure, 18 U.S.C. quoted in material part in the margin [5] that objection to the admissibility of evidence must be accompanied by a reasonably definite statement of grounds in order to inform the court and opposing counsel of the nature of the objection so as to afford an opportunity to remedy the asserted defect may often be honored in the breach, as when the evidence is inadmissible on any ground, when the ground for exclusion is obvious or perhaps when the asserted ground for exclusion could not have been cured. Noonan v. Caledonia Gold Mining Co., 121 U.S. 393, 400, 7 S.Ct. 911, 30 L.Ed. 1061 (1887). See McCormick, Evidence 118 (1954). However, none of these situations is present here. And had the court and opposing counsel been warned by a statement of the ground for the appellants' objection, the asserted defect could either have been readily cured or counsel for the government could have elected to omit the testimony. Under the circumstances of this case we are not disposed to overlook strict compliance with the clear requirement of the common law and Rule 51, supra. The defendants have had the fair trial to which they were entitled. They cannot demand

one free of any error whatsoever. See Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953), in which the Court said: "A defendant is entitled to a fair trial but not a perfect one."

What has already been said disposes of several of the defendants' objections to the court's failure to charge in accordance with their requests. Other of their requests were adequately covered in the charge as given. There was no prejudicial error in the charge.

Arguments and contentions of the defendants not covered in this opinion have been considered only to be rejected as not warranting discussion.

Judgments will be entered affirming the judgments of the District Court.

---

5. "Rule 51. Exceptions Unnecessary

"Exceptions to rulings or orders of the court are unnecessary and for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court *and the grounds therefor*; * * *." (Italics: Added)