UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Taylor THOMPSON, William Edward Tanner and James Benjamin Campbell, Defendants-Appellants.

No. 16832.

United States Court of Appeals
Sixth Circuit.

Sept. 15, 1966.

William E. Badgett, Knoxville, Tenn., for Thompson and Tanner, Tom Taylor, Athens, Tenn., on the brief.

W. P. Boone Dougherty, Knoxville, Tenn., for Campbell.

Charles J. Gearhiser, Asst. U. S. Atty., Chattanooga, Tenn., for appellee, J. H. Reddy, U. S. Atty., Chattanooga, Tenn., on the brief.

Before O'SULLIVAN and PHILLIPS, Circuit Judges, and CECIL, Senior Circuit Judge.

PHILLIPS, Circuit Judge.

Appellants, who were members of the County Council of McMinn County, Tennessee, were found guilty by a jury of violating the general conspiracy statute, 18 U.S.C. § 371. The prosecution grew out of the solicitation and receipt by appellants of a $6,000 kickback from the architects on a county hospital project under the Hill-Burton Act, 42 U.S.C. § 291 et seq. Each of the three appellants was sentenced by the district judge, the Honorable Frank W. Wilson, to a prison term of one year. A fourth defendant was found not guilty and a fifth alleged co-conspirator was not indicted.

The one-count indictment in part charged that defendants, in violation of the conspiracy statute, did:

"* * * unlawfully, wilfully and knowingly conspire, confederate and agree among themselves and with each other and with other persons to the Grand Jury unknown, to defraud the United States of America, in particular the Department of Health, Education and Welfare, a Department of the United States, of its right to have its program for the construction of the

McMinn County Hospital, McMinn County, Tennessee, pursuant to the provisions of the Hill-Burton Act, 42 U.S.C. 291, et seq., as amended, administered honestly, fairly and free from corruption, deceit, trickery, dishonesty and kickbacks.

"7. It was a part of said conspiracy that defendants would cause the Hospital Committee, McMinn County Council, McMinn County, Tennessee, which they dominated and controlled, to employ the firm of Galloway and Guthrey to perform the architectural services required in the construction of the McMinn County Hospital, at a fee representing 6% of the cost of construction.

"8. It was a further part of the said conspiracy that defendants would and did request and solicit a 1% kickback payment from the firm of Galloway and Guthrey.

"9. It was a further part of the said conspiracy that defendants, subsequent to the commitment of funds to the McMinn County Hospital by the Department of Health, Education and Welfare, would and did, on June 4, 1964, induce George H. Galloway and Charles E. Guthrey, doing business as Galloway and Guthrey to kick back and pay to defendants $6000 from the fees paid to Galloway and Guthrey pursuant to the aforesaid employment contract. * * * "

Appellants had been members of the nine-member County Council, the governing body for the local county government, for several years prior to their arrest on June 4, 1964. A preliminary application was filed with the Director, Division of Hospital Services, Tennessee Department of Public Health, on April 24, 1962, seeking federal assistance under the Hill-Burton program, in the construction of a county hospital. Appellants served as members of the Hospital Committee and constituted the majority of this five-member committee. Appellant Thompson was chairman of the committee.

Under the federally sponsored Hill-Burton program, the United States contributes 52 per cent of the construction cost of certain hospitals and other medical facilities, while the local sponsor, in this case McMinn County, contributes 48 per cent.

Local officials were notified by letter under date of October 5, 1962, that federal funds in the amount of $468,000.00 had been set aside under the Hill-Burton Act for construction of the proposed hospital.

The architectural firm of Galloway and Guthrey had performed services for McMinn County on previous occasions. The partners in this firm, George Galloway and Charles E. Guthrey, were the chief Government witnesses. They testified that beginning on December 18, 1962, the appellants and others sought a kickback on the hospital project in return for Galloway and Guthrey being given the architectural contract for the proposed hospital; that they informed FBI agents of these facts on December 20, 1962; that appellants met with them on numerous occasions in 1963, both before and after the contract for the hospital was awarded on February 12, 1963; and that further meetings were held between them and the appellants in 1964 which culminated with the meeting on June 4, 1964, at the Knoxville airport at which time George Galloway delivered the sum of $6,000.00 to appellant Campbell.

### I.

The first contention of appellants is that the district court erred in overruling their motion to dismiss the indictment, the motion for judgment of acquittal made at the conclusion of the Government's proof and appellants' motion for judgment of acquittal made at the conclusion of all proof. The principal argument is that, under the facts in this case, appellants have not violated the general conspiracy statute and have not committed a crime against the United States.

18 U.S.C. Section 371 provides:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined * * * or imprisoned * * *"

In Dennis v. United States, 384 U.S. 855, 859, 86 S.Ct. 1840, 1844, 16 L.Ed. 2d 973, the Supreme Court, in interpreting this statute, said:

"It has long been established that this statutory language is not confined to fraud as that term has been defined in the common law. It reaches 'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of government,' Haas v. Henkel, 216 U.S. 462, 479 [30 S.Ct. 249, 54 L.Ed. 569], quoted in United States v. Johnson, 383 U.S. 169, 172 [86 S.Ct. 749, 751, 15 L.Ed.2d 681]."

In Hammerschmidt v. United States, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968, in reversing a conviction for conspiracy to defraud the United States, the court, speaking through Chief Justice Taft, stated:

"To conspire to defraud the United States means primarily to cheat the government out of ·property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane or the overreaching of those charged with carrying out the governmental intention." 265 U.S. at 188, 44 S.Ct. at 512.

In Haas v. Henkel, 216 U.S. 462, 30 S. Ct. 249, 54 L.Ed. 569, the indictments charged a conspiracy by several defendants to cause the Bureau of Statistics for the Department of Agriculture to issue false cotton reports. In upholding the conviction, the Court said:

"These counts do not expressly charge that the conspiracy included any direct pecuniary loss to the United States, but, as it is averred that the acquiring of the information and its intelligent computation, with deductions, comparisons, and explanations involved great expense, it is clear that practices of this kind would deprive these reports of most of their value to the public, and degrade the department in general estimation, and that there would be a real financial loss. But it is not essential that such a conspiracy shall contemplate a financial loss or that one shall result. The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government. Assuming, as we have, for it has not been challenged, that this statistical side of the Department of Agriculture is the exercise of a function within the purview of the Constitution, it must follow that any conspiracy which is calculated to obstruct or impair its efficiency and destroy the value of its operations and reports as fair, impartial, and reasonably accurate, would be to defraud the United States by depriving it of its lawful right and duty of promulgating or diffusing the information so officially acquired in the way and at the time required by law or departmental regulation. That it is not essential to charge or prove an actual financial or property loss to make a case under the statute has been more than once ruled. Hyde v. Shine, 199 U.S. 62, 81 [25 S.Ct. 760, 50 L.Ed. 90]; United States v. Keitel, 211 U.S. 370, 394 [29 S.Ct. 123, 53 L.Ed. 230]; Curley v. United States [1 Cir.] 130 Fed.Rep. 1; McGregor v. United States [4 Cir.] 134 Fed.Rep. 195". 216 U.S. 479, 480, 30 S.Ct. 253.

In Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, rehearing

denied, 315 U.S. 827, 62 S.Ct. 629, 86 L. Ed. 1222, in affirming in part and reversing in part a conviction for conspiracy, the Court stated that "The indictment charges that the United States was defrauded by depriving it of its lawful governmental functions by dishonest means; it is settled that this is a 'defrauding' within the meaning of § 37 [now § 371] of the Criminal Code." 315 U.S. at 66, 62 S.Ct. at 463.

In Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593, rehearing denied, 345 U.S. 919, 73 S.Ct. 726, 97 L.Ed. 1352, the Court affirmed the convictions of defendants charged with conspiracy " 'to defraud the United States of and concerning its governmental function and right of administering' the immigration laws and the Immigration and Naturalization Service, by obtaining the illegal entry into this country of three aliens as spouses of honorably discharged veterans." In this case veterans had gone to Paris and married French citizens for the purpose of obtaining their entry into the United States under the War Brides Act. The parties to the marriages had no intention to live together as husband and wife and had agreed to take whatever steps necessary to sever their legal ties.

In Harney v. United States, 306 F.2d 523 (C.A. 1), cert. denied, 371 U.S. 911, 83 S.Ct. 254, 9 L.Ed.2d 171, the court affirmed convictions of a conspiracy to defraud the United States under a ninety per cent federally-financed highway program. The evidence established that the Commonwealth of Massachusetts paid an excessive amount for the acquisition of land as a result of the fraudulent acts of the defendants and co-conspirators. The Court held that the cheating and overreaching as to the Commonwealth resulted in an obstruction of a lawful function of the United States, saying:

"It is, of course, not necessary to show that federal funds were actually paid to the Commonwealth in 90% reimbursement for its taking of the Damort land. Conspiracy is a crime even though the contemplated offense may never be consummated. It is enough to show a scheme whereby through fraud federal funds in normal course would be diverted from their true and lawful object. That has been shown, for the thrust of the fraudulent scheme alleged and proved to the jury's satisfaction was directed against and would expend itself on the federal fisc. See McGunnigal v. United States, 151 F.2d 162 (C.A. 1, 1945), cert. denied, 326 U.S. 776, 66 S.Ct. 267, 90 L.Ed. 469 (1945)." 306 F.2d at 531.

The indictment in the present case charges that defendants conspired to defraud the United States of its right to have its program for the construction of the McMinn County Hospital, pursuant to the Hill-Burton Act, administered honestly, and fairly, and free from kickbacks.

Appellants contend that there has been no interference with or obstruction of a lawful function of the United States and no conspiracy to defraud the United States; that the Government was not cheated out of any funds or property; that the kickback had no connection with Hill-Burton funds in that the architectural fees were paid by McMinn County and Hill-Burton funds were not related to this payment; and that the hospital as built is apparently free of architectural defects, so that the United States and McMinn County received full value for the payment for architectural services, regardless of the kickback.

 Even if it should be found that there is no proof that the Government has been cheated out of money or property, this would be irrelevant under the foregoing decisions. Likewise the fact that McMinn County may have received a hospital free from any apparent defects is a spurious argument. The question is whether or not the Hill-Burton Act was administered honestly and without corrupt influence. The district court instructed the jury on this point in the following language:

"Now in order that you may better understand the indictment and the statute upon which it is based, which I

have just read to you, let me define some of the terms used either in the indictment or in the statute. In the indictment you will notice that the word unlawfully is used and in essence this means contrary to law. Hence to do an act 'unlawfully' means to willfully do something which is contrary to law. The act, an act is done willfully if it is done voluntarily and with the specific intent to do that which the law forbids; that is to say, with bad purpose either to disobey or disregard the law. You will note that the acts charged in the indictment are charged to have been done knowingly. The purpose of adding the word knowingly was to insure that no one would be convicted of an act done because of mistake or inadvertence or any other innocent reason. The word 'defraud' as used in the statute means to deceive or to cheat; to deprive another of a right, either by obtaining something by deception or artifice, by appropriating something wrongfully, or by taking something wrongfully without the knowledge or consent of the owner, in this case the United States of America. To conspire to defraud the United States as those words are used in the indictment and as they are used in the statute that I have read to you means either one or both of two things; in the first place, it can mean to conspire to cheat the United States Government or some agency thereof out of some property right, or pecuniary interest. That's one meaning of the term 'to defraud the United States.' A second meaning of the term 'to defraud the United States' means to conspire to interfere with or to obstruct some lawful function of the United States Government or a department or agency thereof by deceit, or craft, or trickery, or some dishonest means.

"A conspiracy to accomplish either of the foregoing purposes would be a conspiracy to defraud the United States as the word, as the words 'defraud the United States' are used in the statute that I have read to you and in the indictment.

"You are further instructed that the expenditure of funds under the Hill-Burton Act 42 United States Code, Section 291 and following, to assist the states in constructing hospitals is a lawful function of the United States Government. The United States Government has a right to have these funds administered in accordance with the law and administered honestly and without corrupt influence, or bribery, or kickbacks or fraudulent rebates.

"In regard to the Hill-Burton Act, you are instructed that the Hill-Burton Act neither authorizes nor requires the payment of any set or any specific architectural fee in the construction of a hospital under the Act.

"Now let me turn your attention to the definition of a conspiracy. A conspiracy is a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. While it involves an agreement to violate the law, it is not necessary that the persons charged met together and entered into any express or any formal agreement, or that they stated in words or writing what the scheme was to be, or how it was to be effected. It is sufficient to show that they tacitly came to a mutual understanding to accomplish an unlawful act.

"In this instance the alleged unlawful act was to defraud the United States as I have defined those terms for you. It is only a conspiracy to defraud the United States that constitutes the offense here charged, and not a conspiracy to defraud any other persons or party.

\* \* \* \* \* \*

"Thus, a conspiracy is in the nature of a partnership to violate the law. There must be intentional participation in the illegal scheme or design or purpose. If the parties in any manner work together to advance an unlawful scheme, having its promotion in view

and actuated by a common purpose of accomplishing the common unlawful end of defrauding the United States, then they would be guilty of a conspiracy."

Appellants contend that the $6,000 kickback money came from the personal funds of Galloway and Guthrey, which in turn came from the funds of McMinn County, and that there is no showing that any part of this $6,000 was reimbursed from federal funds. There is evidence in the record from which the jury could have concluded that the county was reimbursed from Hill-Burton funds for part of the architects' fee. Federal funds in the amount of $468,000 tentatively had been committed as early as October 5, 1962. This commitment was based upon contemplated cost of the hospital, which it is reasonable to believe included architect fees. "Project Construction Application—Part 4," dated May 11, 1964, and signed by the County Manager, itemized under the heading "Estimate Costs in Which the Federal Government May Participate," architects fees in the amount of $39,554.00. On January 18, 1963, the Director of the Division of Hospital Services of the Tennessee Department of Public Health, administering the Hill-Burton hospital program, advised that $468,000 of federal funds had been set aside for the McMinn County hospital, based upon a total estimated cost of $900,000. This letter also requested a copy of the contract with the architects. It is clear from the record that the Hill-Burton hospital and the architect fee were very much interwoven and related.

One of the architects testified that "We told them we would consider doing the hospital for five per cent in lieu of our normal fee of six per cent and giving the county back one per cent rather than a group of individuals. He didn't seem to think they would agree to it." If the architect fee had been five per cent, and if the one per cent kickback had been eliminated, there would have been a substantial saving in costs, fifty-two per cent of which would have been reflected in Hill-Burton funds.

We hold, however, that it was not necessary under the foregoing decisions for the Government to prove that part of the architect fee was reimbursed with federal funds. We construe the payment of the $6,000 kickback as an overt act in furtherance of a conspiracy to obstruct a lawful Government function. The administration of this Hill-Burton project, from shortly after tentative commitment through final acceptance, included a dishonest influence in the form of a kickback. This constituted a crime within the scope of the statute under the facts of this case.

Appellants further contend that the kickback was for the purpose of obtaining a school contract (locally financed) and not the hospital contract. The chief Government witnesses, Galloway and Guthrey, testified that the kickback was for the hospital contract. This presented a jury question, and the jury answered this issue adversely to appellants.

We hold that the district court did not err in overruling appellants' motions to dismiss the indictment and their motions for acquittal; and that there is substantial evidence, taking the view most favorable to the Government (Glasser v. United States, supra, 315 U.S. at 80, 62 S.Ct. 457, 86 L.Ed. 680) to support the verdict of the jury that appellants were guilty of committing an offense against the United States in violation of 18 U.S.C. § 371.

## II.

Appellants further contend that the district court erred in failing to hold that, if there were a violation of the statute, appellants were entrapped as a matter of law, and in failing to grant a verdict of acquittal on this ground.

This contention is based upon the fact that beginning on December 20, 1962, the FBI was aware of the conspiracy. On that date Galloway and Guthrey went to local FBI agents and informed them that

appellants had approached the architectural firm seeking a one percent kick-back on the proposed hospital contract. From this date until June 1964 both Guthrey and Galloway made several statements to the FBI. Mr. Galloway on cross-examination testified that:

"Q If you didn't intend to give any kick-back, and there wasn't any federal funds involved, why did you go to the FBI on the morning of December 20, 1962?

"A We were quite concerned about it, we thought at the time they were federal funds, we didn't know. It had been advertised as the Hill-Burton hospital which is a federally endowed hospital, and we didn't know who to go to, so we finally decided to go to the FBI. They were talking about a federal project.

"Q There weren't any federal funds involved then and you hadn't agreed to a kick-back, let me ask you this. Were you trying to entrap somebody?

"A I wasn't trying to do anything, I was just trying to find out what was going on. We went to the FBI to report it.

"Q And to seek their advice on what to do?

"A Yes, we went to seek their advice.

"Q I'll ask you if it isn't true that from that day on, December 20, 1962, up through June 4, or even later, if you didn't make periodic reports to the FBI all the way through, and receive their advice?

"A We didn't receive advice, they told us from the beginning that they couldn't tell us what to do, the decision was ours. They did say we should report to them what transpired.

"Q And you did periodically go there and give interviews, make statements under oath, and all that?

"A Yes.

"Q They didn't protest, they took those statements from you?

"A They took them. I made the statements, I dictated the statements, two or three of them myself, to their stenographer.

"Q Didn't they tell you that they talked to—didn't Mr. Ingram tell you that he talked to the attorney general here about the possibility of being a federal violation?

"A They were going to contact the US attorney to determine whether or not there was a federal violation.

"Q Now, a federal violation of what?

"A This kick-back.

"Q There hadn't been any kick-back then, had there?

"A I can't enlighten you any further. I mean, this was the reason we went there, just simply to try to find out what we should do.

"Q You mean you went there to see whether or not if you went on through and promised a kick-back, you could lead them into a federal violation?

"A No, sir, I resent that, because these people didn't tell us to do anything. As a matter of fact they made it very clear that they were an investigating agency and they could not tell us what to do, and whatever decision we made it was our own."

In Sorrells v. United States, 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413, the Court, speaking through Chief Justice Hughes, said:

"[T]he controlling question [is] whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials."

In reaffirming its opinion in Sorrells the Court stated in Sherman v. United States, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848.

"[T]he fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment. En-

trapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials. (Emphasis supplied.) See 287 U.S., at 441, 451 [53 S.Ct. 210, at 212, 216]. To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal."

Further in Sorrells, the Court said:

"It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. Grimm v. United States, 156 U.S. 604, 610 [15 S.Ct. 470, 39 L.Ed. 550]; Goode v. United States, 159 U.S. 663, 669 [16 S.Ct. 136, 40 L.Ed. 297]; Rosen v. United States, 161 U.S. 29, 42 [16 S.Ct. 434, 40 L.Ed. 606]; Andrews v. United States, 162 U.S. 420, 423 [16 S.Ct. 798, 40 L.Ed. 1023]; Price v. United States, 165 U.S. 311, 315 [17 S.Ct. 366, 41 L. Ed. 727]; Bates v. United States [C.C.] 10 Fed. 92, 94, note, p. 97; United States v. Reisenweber [2 Cir.] 288 Fed. 520, 526; Aultman v. United States [5 Cir.] 289 Fed. 251." 287 U.S. at 441, 53 S.Ct. at 212.

The law of entrapment was reviewed and applied by this court in United States v. Gosser, 339 F.2d 102 (C.A.6), cert. denied, 382 U.S. 819, 86 S.Ct. 44, 15 L.Ed. 2d 66. See also United States v. Littwin, 338 F.2d 141 (C.A.6), cert. denied, 380 U.S. 911, 85 S.Ct. 896, 13 L.Ed.2d 797; Morales v. United States, 260 F.2d 939 (C.A.6); Nero v. United States, 189 F. 2d 515 (C.A.6), cert. denied, 342 U.S. 872, 72 S.Ct. 115, 96 L.Ed. 656, rehearing denied, 342 U.S. 899, 72 S.Ct. 232, 96 L. Ed. 673; and Cermak v. United States, 4 F.2d 99 (C.A.6).

In the present case the testimony establishes that the impetus for the conspiracy came from the appellants. This is not a case where the criminal conduct was the product of creative activity of Galloway and Guthrey or FBI agents. It therefore cannot be held that entrapment is established as a matter of law. Thus, "the issue of whether a defendant has been entrapped is for the jury as part of its function of determining the guilt or innocence of the accused." Sherman v. United States, supra, 356 U.S. 369, 377, 78 S.Ct. 819, 823, 2 L.Ed.2d 848. See also Masciale v. United States, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859, rehearing denied, 357 U.S. 933, 78 S.Ct. 1367, 2 L.Ed.2d 1375; Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L. Ed.2d 462, rehearing denied, 375 U.S. 870, 84 S.Ct. 26, 11 L.Ed.2d 99.

### III.

■ Appellants further contend that the jury was improperly instructed on the law of entrapment.

The charge of the court is as follows:

"The defense of unlawful entrapment has been offered in this case on behalf of the defendant charged in the indictment. In this regard I would instruct you that the law recognizes two kinds of entrapment—lawful entrapment and unlawful entrapment. where a person has no previous intent or no previous purpose to violate the law, but is induced or persuaded by law enforcement agents to commit a crime or agents of the government, he is entitled to the defense of unlawful entrapment because the law as a matter of policy forbids a conviction in such a case.

"On the other hand, where a person already has the readiness and willingness to violate the law or to break the law, the mere fact that government agents provide what appears to be a favorable opportunity this is not unlawful entrapment and the mere fact that the government seeks to collect evidence of the offense, this would not constitute unlawful entrapment and consequently would be no defense, rather this would be lawful entrapment. Unlawful entrapment can only exist where a law enforcement officer or an agent of the government sug-

gests or induces or persuades a person to commit an offense. An agent of the government may include, of course, any person acting upon the instructions or directions of any law enforcement officers of the United States.

"If then the jury should find from the evidence that, before anything at all occurred respecting the alleged offenses involved in this case, the defendant or any particular defendant was ready and willing to commit the offense such as that charged in the indictment whenever the opportunity was afforded, and the government, at the most, merely offered the opportunity to commit the offense or was merely collecting evidence of the commission of the offense, the accused is not entitled to the defense of unlawful entrapment. Likewise, if an officer or agent of the government or one acting on behalf of the government is not a party to the inducing or persuading or suggesting of the commission of an offense, then no unlawful entrapment could exist, and no defense of unlawful entrapment could be asserted by the defendant.

"If, on the other hand, the jury should find that the particular accused had no previous intent or no purpose to commit any offense of the character here charged, and he did so only because he was persuaded to do so or induced to do so by some agent of the government, then the prosecution has in effect misled an innocent person, and the defense of unlawful entrapment is a good defense, and the jury should acquit such particular accused."

This charge is based substantially upon "Jury Instructions and Forms for Federal Criminal Cases," by the Honorable William C. Mathes. We hold it to be a correct statement of the law. Sherman v. United States, supra, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848; Masciale v. United States, supra, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 848, rehearing denied, 357 U.S. 933, 78 S.Ct. 1367, 2 L.Ed.2d 1375; Sorrells v. United States, supra, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413; Silva v. United States, 212 F.2d 422 (C.A.9); Eastman v. United States, 212 F.2d 320 (C.A.9); Trice v. United States, 211 F.2d 513 (C.A.9), cert. denied, 348 U.S. 900, 75 S.Ct. 222, 99 L.Ed. 707.

IV.

It is further asserted that the district court erred in admitting the testimony of FBI Agent Polattie concerning statements made by appellant Thompson after his arrest, at a time when he was not represented by counsel.

The statements complained of were not incriminating admissions and were offered by the Government solely to corroborate witnesses Galloway and Guthrey on the fact that meetings had been held between the parties. Counsel for Thompson read extensively from Thompson's statement during the trial and finally offered it in evidence.

Agent Polattie testified that he warned Thompson of his constitutional rights, including his right to remain silent and his right to counsel. There is no showing that Thompson ever asked for or was denied the assistance of counsel. Thompson was arrested at his home in Etowah, Tennessee, on June 4, 1964, at 6:30 p.m. under a warrant issued earlier that day. He was taken to the FBI office in Knoxville, Tennessee, for about twenty-five minutes of questioning, then was taken before the United States Commissioner that same evening.

Under these facts, appellants' reliance upon Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, and Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265, is misplaced.

The trial took place in July 1965. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, is not applicable. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.

## V.

Complaint also is directed to the refusal of the district judge to submit three special requests in his charge to the jury. We find the charge, considered as a whole, adequately covered the theories of the defense and that no reversible error was committed in the refusal of the district judge to grant the requests for special charges.

All other contentions have been considered and are found to be without merit.

Affirmed.