UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph D. BEASLEY, M.D.,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Oscar E. KRAMER, Jr.,
Defendant-Appellant.

Nos. 75–2223, 75–4147, 75–1929.

United States Court of Appeals,
Fifth Circuit.

April 8, 1977.

Rehearing and Rehearing En Banc
Denied May 9, 10, 1977.

See 553 F.2d 100, 101.

Arthur A. Lemann, III, William J. O'Hara, III, New Orleans, La., for defendant-appellant in Nos. 75–2223 and 75–4147.

Gerald J. Gallinghouse, U.S. Atty., Don M. Richard, Asst. U.S. Atty., New Orleans, La., for plaintiff-appellee in Nos. 75–2223, 75–4147 and 75–1929.

James D. Carriere, Asst. U.S. Atty., New Orleans, La., for plaintiff-appellee in Nos. 75–2223 and 75–1929.

John Volz, Federal Public Defender (Court-Appointed), Richard T. Simmons, New Orleans, La., for defendant-appellant in No. 75–1929.

Before GOLDBERG, SIMPSON and FAY, Circuit Judges.

FAY, Circuit Judge:

These appeals arise from the convictions and lower court's denial of post-trial motions of two appellants who were tried by juries and found guilty of violating the general conspiracy statute, 18 U.S.C. § 371 and § 2, and of filing or causing to be filed false claims, as proscribed by 18 U.S.C. § 287 and § 2.[1] Finding no merit in any of the many assignments of error, we affirm.

More specifically, Count I charged Dr. Joseph Beasley, Oscar Kramer, and other named persons with conspiracy to defraud the United States through the United States Department of Health, Education and Welfare (HEW), of its right to have its program under Title IV–A of the Social Security Act administered fairly, honestly and free from corruption, deceit, trickery, and dishonesty. The means by which the

---

1. 18 U.S.C. § 2, is the aiding and abetting statute.

defendants accomplished the conspiracy were: (1) by presenting claims for approximately $659,580 to the State of Louisiana allegedly representing construction costs for 15 mobile modular clinics which were never constructed and the money diverted to other purposes, knowing that the State of Louisiana would be reimbursed for a substantial portion of the money by the United States; (2) by adding to the cost of 27 mobile modular clinics approximately $4,400 each, knowing that the added cost, totaling approximately $118,800 did not form any part of the purchase price of the clinics and constituted no legitimate authorized expenditure under the existing contract between the Foundation and the State of Louisiana, and then presenting claims for the added cost to the State of Louisiana knowing that the State would be reimbursed by the United States for a substantial portion of the money claimed; (3) by falsifying, concealing, and covering up by trick, scheme, and device material facts concerning the mobile modular clinic transactions from the federal auditors.

Counts II and III charged Beasley, Kramer and others with substantive violations of 18 U.S.C. § 287 and § 2. Count II alleged that the defendants made and presented claims of approximately $52,800 to the United States through the State of Louisiana knowing the claims to be false, fictitious, and fraudulent in that they did not form any part of the purchase price of mobile modular clinics and constituted no legitimate authorized expenditure under the contract between the Foundation and the State of Louisiana.

Count III alleged another violation of 18 U.S.C. § 287 and § 2 involving claims of approximately $66,000. The false, fictitious, and fraudulent nature of these claims was the same as alleged in Count II.[2]

## BACKGROUND

Dr. Beasley and Mr. Kramer went to trial on January 10, 1975. After completion of the government's case, Kramer was called as a witness by and testified on behalf of Beasley. A mistrial was then declared as to Kramer. The trial of Beasley continued, but it resulted in a mistrial when the jury was unable to return a verdict.

The government brought Kramer to trial for the second time and on March 11, 1975, the jury returned a verdict of guilty as to all three counts. The defendant was subsequently sentenced to serve two years on each count to run concurrently. Kramer appeals this conviction.

The retrial of Dr. Beasley began on March 12, the day following Kramer's verdict, and on March 17, Beasley was found guilty and later received the same sentence. Subsequently, Beasley filed an alternative motion to dismiss the indictment or for new trial, and from the district court's denial of this motion, Beasley appeals.

It should be noted that this Court entertains no doubt as to the many good things accomplished by the Family Health Foundation and the appellants. Their work for the individual, the scientific and professional communities, and society as a whole is admirable and commendable. Nonetheless, their greed provoked criminal actions which cannot be ignored or excused.

Appellants were involved with a social-economic welfare program funded by federal-state cooperation. Pursuant to Title IV–A of the Social Security Act (42 U.S.C. § 601 et seq.), states that provide family planning services to families receiving benefits through the Aid to Dependent Children program may be reimbursed from federal funds for 75% of the cost until January 1, 1973, and for 90% of the cost after that date. Louisiana, with the approval of HEW, contracted with the non-profit corporation, Family Health Foundation, to provide these services for its citizens. The Foundation would incur an expense and bill the state, the state would pay the Founda-

2. Originally the indictment contained a Count IV and Count V, with Beasley named in both and Kramer only in Count IV. Although the lower court denied appellants' motions to dismiss these counts, the government dismissed them before trial.

tion, and the state would then be reimbursed by the federal government.[3]

During the time covered in the indictment, Dr. Beasley was the chief executive officer of the Foundation and Kramer, an attorney, was director of the Louisiana Family Planning Program, comptroller of the Foundation, and later a paid consultant of the Foundation. The executive assistant to appellant Beasley during the period of time covered by the indictment was Eugene Wallace, Jr., also an attorney and originally a co-defendant.[4]

Pursuant to its contract, the Foundation presented to the state claims for thirty-seven mobile modular clinics. The indictment alleged and the verdicts of the juries indicate they found that these claims were, in effect, submitted to an agency of the federal government, namely HEW, and that they were false or fraudulent in that (a) $4,400, which formed neither part of the purchase price nor any other legitimate expense, was "added-on" to the construction price of twenty-seven of the thirty-seven clinics and (b) fifteen of the twenty-seven clinics were never constructed. The government's theory is that appellants' procedure of inflating claims was part of a scheme to channel $50,000 to one Sherman Copelin[5] through a New York consulting firm, Scholarship, Education and Defense Fund for Racial Equality [SEDFRE].[6] The government also proved that the conspirators concealed the above transactions by later submitting certain false reports in response to the federal auditor's questions concerning the transactions.[7]

3. This case involved fiscal year 1972–1973. According to the briefs submitted by the government, the total expenses billed by the Foundation to the State was approximately $8.4 million of which 75–90% was paid by the United States. In fiscal year 1973–1974, the federal government provided 93% of the Foundation's revenue; of a total budget of $17.9 million, $480,331 were private funds, $750,000 were state funds, and $16.7 million were federal funds.

4. Wallace plead guilty to Count I, for which he received a suspended sentence, and testified as a government witness against Beasley and Kramer. The government dismissed the other charges against him.

5. The Foundation also had a $3.5 million annual Model Cities contract through the City of New Orleans and the United States Department of Housing and Urban Development (HUD) to staff and maintain neighborhood health clinics. Sherman Copelin was the Director of the New Orleans Model Cities program and, in effect, the supervisor of the Foundation's Model Cities contract.

6. The evidence in the light most favorable to the government shows that Copelin wanted to leave public employment and begin his own consulting firm in New Orleans. He and an associate of his, Don Hubbard, asked Beasley for $100,000 "seed money" from the Foundation. Beasley and Wallace told Copelin that the Foundation could not come up with $100,000 cash, but could put Hubbard on the Foundation's payroll and give $50,000 cash to Copelin. Eventually, as a way of getting the money for Copelin, the defendants decided to claim the added expense in the cost of the construction of 12 mobile clinics. They arranged for the contractor to bill the extra amount and then siphon it through SEDFRE to Copelin, with Kramer explaining to the contractor that the added cost was the only way the Foundation could purchase a day care study from SEDFRE. SEDFRE's executive director was Ronnie Moore, a friend of Don Hubbard. Moore agreed to accept the contractor's checks and then send SEDFRE's checks to Copelin. The $4,400 added on to the cost of each of the twelve clinics (totalling $52,800) forms the basis of Count II.

Kramer later instructed Foundation employees to prepare additional purchase orders for 15 clinics, but to hold and not deliver them to the contractor. The inflated costs for these clinics forms the basis of Count III charging a false claim, and the total cost of these clinics, which were never built, forms the basis of Part C(1) of Count I.

7. A private accounting firm discovered the issuance and nondelivery of the purchase orders and also the contractor's payments to SEDFRE. The defendants then decided that some work product with a SEDFRE label on it was necessary, so Kramer and Hubbard, per Beasley's instructions, went to New York and prepared a day care study and back-dated bills using SEDFRE's letterheads, typewriter and report covers which had been supplied by Moore. In an effort to explain the added cost to the accountant, the defendants and the contractors represented that this day care study was the work product of SEDFRE paid for by the contractors and billed to the Foundation.

When federal auditors began an audit of the Foundation in the Spring of 1973, Beasley, Kramer, and their staff prepared a "Modular Clinic File" which was represented to contain a

## ASSIGNMENTS OF ERROR

The first two assignments of error in Beasley's appeal concern the third appearance of Ronnie Moore before the Grand Jury in December, 1974, subsequent to appearances in November, 1973, and on March 19, 1974, the date of the indictment. Beasley contends that the primary purpose of the Grand Jury proceedings in December of 1974 was to secure the trial testimony of Moore. Beasley argues that the government's employing the Grand Jury for investigative purposes against the defendants ten months after indictment and one month prior to trial was a misuse of the Grand Jury and deprived him of his rights to due process and a fair trial. Beasley further contends that Moore's recantation at the December Grand Jury proceeding was not proper under the provisions of Title 18, U.S.C. § 1623(d), and that his appearance and subsequent trial testimony were the result of a "deal" that should have been disclosed to the court, jury and defense counsel.

Subsection (d) of § 1623, the recantation statute, reads:

> Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.

■ We find that Moore's appearance before the Grand Jury in December was proper under this statute. When the government suspected that Moore had not told the truth during his first two appearances before the Grand Jury, they informed him that they were going to ask the Grand Jury to consider a false statement indictment against him, unless he appeared and recanted his prior false testimony. Moore had every right under 18 U.S.C. § 1623(d) to appear and recant in order to "save his own neck." There is nothing improper about the government continuing its investigation after an indictment is filed, with obvious limitations, of course. For example, the government cannot contact the defendant after an indictment is filed against him. Similarly, prosecutorial agents may not use the Grand Jury for the primary purpose of strengthening its case on a pending indictment or as a substitute for discovery, although this may be an incidental benefit. See *Beverly v. United States,* 468 F.2d 732 (5th Cir. 1972). However, it is not improper and indeed totally consistent with the duty of assistant United States attorneys to advise a witness that there exists a serious doubt or question about that witness' testimony.

■ Appellant suggests that Moore's recantation was not legitimate under § 1623(d) since the government was aware of the falsity of Moore's original testimony before he offered to recant. The statute presents two conditions for recantation to be a bar to subsequent prosecution: (1) the person admits the falsity in the same continuous proceeding; (2) at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed. Although the second condition used the disjunctive "or" between substantial effect and exposed falsity, we need not decide whether the existence of one would be sufficient to permit prosecution, for no one here is challenging recantation as a bar to prosecution.

In the instant case, the trial judge found that the primary purpose of calling Moore

complete and detailed explanation of the clinic program, including the added costs. As a result of the HEW audit, the Foundation prepared and submitted a response, which also contained misrepresentations as to the facts surrounding the add-on to the cost of the clinics and the reason why the construction of the last 15 clinics was never authorized.

The defendants contended throughout their trial that day care centers were an appropriate concern of family planning and that Copelin and his associates were capable of providing a day care center study which the Foundation needed, but that a direct contract with Copelin was not feasible for political reasons.

before the Grand Jury in December was not one of gathering evidence against Dr. Beasley. We agree. The principal reason was to present to the Grand Jury the question of false statements under 18 U.S.C. § 1623 or provide an opportunity to recant. Moore chose to recant. There was no sham here, and there was no "deal". Copies of the transcript of Moore's testimony at each of the three Grand Jury appearances were given to Beasley's counsel prior to the commencement of the first trial. The trial had not commenced and no prejudice resulted to the appellant.

Beasley next submits that the government did not disclose exculpatory statements of its immunized witnesses, Copelin and Hubbard,[8] and thus deprived Beasley of his rights to a fair trial and due process. The trial court found and, again, we agree, this assertion is unfounded.

▮ It is true that the government for reasons of its own decided not to call Copelin and Hubbard as witnesses. Nonetheless, a summary of Hubbard's statements and a memorandum prepared by Mr. Heusel, an Assistant United States Attorney, concerning an interview with Copelin in March of 1974 were given to defense counsel. The evidence indicates that the only difference between Copelin's statements at his first interview in March, 1974, and those at his second interview in January, 1975 (the notes of which were not given to Beasley), was that Copelin "knew" rather than "thought" his $1000 a month payments came from Beasley. Not only is this slight change in terminology insignificant but it does not concern the modular clinics and testimony regarding these transactions was excluded by the trial judge. The trial judge also offered to call Copelin and Hubbard as the court's witnesses if either the government or defense desired it, but neither side accepted the court's offer.

The Supreme Court, in considering the government's duty to disclose exculpatory material under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), stated:

But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial . . .

The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense . . . The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt . . . This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. . . .

*United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342, 352–53 (1976).

When considering Beasley's motion for new trial, the trial judge evaluated the appellant's contention that the government withheld exculpatory material from him. In denying the motion, the district judge stated:

[T]here is no indication that the Government withheld anything from the Defendant. And, indeed, as the record well shows, when the Court perceived that it was likely that Mr. Copelin would not be called, and a good deal of the testimony seems to revolve around what it did, it proffered the opportunity to examine those witnesses to both parties.

Finally, it is evident from the notes that were given the Defendant that the Defendant knew what in substance Mr. Copelin would say. So I see nothing that was withheld nor anything that would have altered the result . . .

Nothing I have heard in this hearing, nothing that has been offered in evidence persuades me that the defendant had aught but a fair trial, nothing I have seen in the evidence and nothing I have heard

---

8. The government formally granted immunity to Copelin, but never to Hubbard.

from the witness stand or read in the briefs persuades me that the prosecutor violated the mandates of *Brady v. Maryland* and withheld from the defendant exculpatory material that he should have disclosed.

The record does not support Beasley's argument, the findings of the trial court are certainly not clearly erroneous, and the issue is without merit.

Beasley also assigns as error the district judge's ruling regarding the immunity of Copelin and Hubbard. At the hearing on the post-trial motions, Beasley wanted Copelin and Hubbard to testify regarding what Beasley contended were exculpatory statements made by them about him. Appellant believes that Copelin and Hubbard should have been commanded to testify at this hearing under the statutory or equitable immunity already granted them.[9]

■ The district court observed that the government did nothing to seal Copelin's lips and correctly noted that "[c]learly the government is not required to grant immunity to a witness from prosecution in order to secure him as a witness to someone else." The trial court held that it could require Copelin to testify at the post-trial hearing about any matter within the scope of his grant of immunity, but that it could not require him to testify about any other matters for which he had the right to claim his Fifth Amendment privilege. Hubbard was never given immunity and therefore consistently asserted his right to remain silent, as he was expected to do at the post-trial hearing, and rightfully so. Although Beas-

ley's reason for wanting Copelin and Hubbard to testify at the hearing was to show a contradiction, the trial court also found that Copelin's testimony was not "inherently contradictory" of either Wallace's or Moore's testimony. The district court's understanding and application of the law of immunity is correct, and thus we find no error here.

Beasley next asserts that the district court erred when it denied his motion for continuance filed on the morning of trial since a continuance was a simple administrative remedy sought by the defense in order to override the community prejudice generated by Kramer's conviction the day before Beasley's trial commenced. The record reveals, however, that the issue of community prejudice had been raised and considered by the court several times.

■ Shortly after the indictment was returned, Beasley requested and was granted a change of venue from New Orleans to Jacksonville, Florida on the basis of community prejudice generated by adverse publicity in the media. Under the representation of new counsel, Beasley was later granted a requested change of venue back to New Orleans because allegedly the conditions that existed earlier were no longer present. After Beasley's first trial ended in a mistrial, the district court scheduled the severed Beasley and Kramer trials one right after the other for one and a half months later. Nobody objected. The district court even ordered the jury for Beasley's retrial to be sequestered prior to the return of the Kramer verdict but, on recon-

---

**9.** 18 U.S.C. § 6002 (1976) reads in pertinent part as follows:

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—
(1) a court or grand jury of the United States . . . and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such

testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order. . . .

Appellant Beasley submits that the disclosures made at the office interviews were "compelled" within the above statute, were made only after the witnesses relinquished their Fifth Amendment right to silence in exchange for immunity, were "ancillary" to the main proceeding, occurred in trial preparation of the pending indictment, and were substantially related to the matters about which the witnesses were granted immunity.

sideration, withdrew its order when neither Beasley nor the government desired sequestration. Furthermore, at the hearing on Beasley's motion for continuance on the morning his trial was to begin, his defense counsel conceded that it had elected only two days earlier to proceed on the scheduled date regardless of the Kramer verdict. Considering the totality of the circumstances, there is no indication that Beasley's trial was fundamentally unfair. *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Calley v. Callaway*, 519 F.2d 184 (5th Cir. 1975). The district court made every effort to conduct a voir dire that would assure no jurors prejudiced by pre-trial publicity. The district judge found:

> The jury panel was carefully examined with respect to the effect any publicity about the Kramer verdict might have on their consideration of this case. Most of the members of the venire stated they had neither read newspaper accounts, nor seen television accounts, nor heard radio accounts of the case. All prospective jurors who felt that their judgment might be influenced in any way were excused. At the conclusion of voir dire, the court asked counsel to suggest any more veniremen who could be challenged for cause. They suggested none. The voir dire gave counsel an opportunity to eliminate any conceivable prejudicial effect the Kramer verdict might have had on this trial, and they took it.

> For these reasons, I think the jury panel was not influenced by the pre-trial publicity, that the jury selected represented a fair and impartial cross section, and that the trial, whatever its outcome, will be to a jury of the defendant's peers, capable of deciding the case solely on the evidence before it.

The court went out of its way to ensure a fair and impartial jury, one uninfluenced by the results of the Kramer trial. In light of all the above factors, appellant may not complain now as to his trial date or the denial of his request for a continuance.

Three assignments of error raised by Beasley and Kramer are substantially the same, and therefore we shall consider them together.[10] The first attacks the adequacy of the allegations in the indictment and their purported vagueness. Beasley contends first that Count I, the conspiracy count, insufficiently charges an offense against the United States and, second, that the language in the indictment describing the means used by the conspirators to defraud the United States (the submission of "claims for monies to the State of Louisiana which included approximately $659,580.00 allegedly representing construction cost for fifteen mobile clinics which were never constructed and the monies derived therefrom were diverted to other purposes . . . .") is too ambiguous to reveal the meaning intended by the Grand Jury. Thus, Beasley argues, the conviction on the entire first count must fail because the verdict on this count was a general verdict.

Kramer challenges the district court's denial of his motion to dismiss, reiterating his contentions that the indictment was conclusive in nature, merely alleged a breach of contract in vague and indefinite terms,[11] and failed to set forth the false nature of certain reports voluntarily submitted to the government (Counts IV and V concerned these reports; see n. 2 *supra*). Appellant is especially concerned with the alleged ambiguity of the objects of the conspiracy count, particularly the first object which he submits is unconstitutionally vague and inadequate in notifying the defendant of the charge against him. Both Beasley and Kramer also question the absence of the allegation of willfulness in Counts II and III of the indictment.

---

**10.** Beasley also adopts the remainder of Kramer's assignments of error.

**11.** In particular, appellant submits that the phrase "no legitimate authorized expenditure under the existing contract" as used in the first three counts of the indictment was vague due to various possible interpretations of the phrase "actual operating costs incurred by FHF [Family Health Foundation] in furtherance of the State contract."

■ It is well settled that there may be a single continuing agreement to commit several offenses by a multiplicity of means. *United States v. Crosby*, 294 F.2d 928, 945 (2nd Cir. 1961), *cert. denied*, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962); *Mansfield v. United States*, 155 F.2d 952, 953 (5th Cir. 1946).

■ We find that the conspiracy count of the indictment sufficiently informed the defendants of the nature of the charge against them and that it stated in plain, concise, and definite terms the essential facts constituting an offense under 18 U.S.C. § 371, as required by Rule 7, F.R. Crim.P. It is perfectly clear that the indictment alleges a conspiracy to defraud the United States, the making of false claims for money against the United States, and the concealment of material facts within the jurisdiction of a federal agency. Certainly a conspiracy may have more than one objective and these are clear from a fair reading of the indictment. The allegations in the second object of the conspiracy track the language of the substantive false claims statute, 18 U.S.C. § 287, and are therefore permissible providing the indictment sets forth fully, directly, and expressly all essential elements of the crime. *United States v. Lester*, 541 F.2d 499 (5th Cir. 1976); *Downing v. United States*, 348 F.2d 594, 599 (5th Cir. 1965), *cert. denied*, 382 U.S. 901, 86 S.Ct. 235, 15 L.Ed.2d 155; Wright, 1 Fed. Prac. and Proc. 236 (1969). This is especial-

ly true where, as here, the charge is made specific as to time and place. See *United States v. McPhatter*, 473 F.2d 1356, 1358 (5th Cir. 1973). We do not find the phrases "actual operating costs" or "no legitimate authorized expenditure" under the contract vague or ambiguous. The indictment contained the elements of the charged offense, apprised the defendants of what they must meet, and specified the extent of the charges in the present indictment to avoid double jeopardy. See *Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). Thus, the indictment was sufficient and the district court did not err when refusing to dismiss it.

■ In response to appellants' contention that willfulness is an essential element to a false claim violation under 18 U.S.C. § 287, making the substantive offenses charged in Count II and III fatally defective due to the lack of a willfulness allegation, we simply hold that the concurrent sentence doctrine renders this issue moot. *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1956); *United States v. Stone*, 472 F.2d 909, 916 (5th Cir. 1973).[12]

The appellants next submit that the indictment fails to allege an offense against the United States in that the charges of false claims, false statements and conspiracy to defraud were all directed to the State of Louisiana and only indirectly

---

**12.** Appellants rely heavily upon *United States v. Mekjian*, 505 F.2d 1320 (5th Cir. 1975) and *Johnson v. United States*, 410 F.2d 38 (8th Cir. 1968), *cert. denied* 396 U.S. 822, 90 S.Ct. 63, 24 L.Ed.2d 72 (1969). These cases do not provide the comfort sought. *Mekjian* arose under 18 U.S.C. § 1001, where both willfully and knowingly are required by the words of the statute. In *Johnson* the court seems to be holding that when one is charged with knowingly making a false claim and evidence is adduced showing knowledge of the requirements of the contract with the governmental agency and the complete disregard for such, and thereafter the jury is properly charged regarding the necessity of the government proving that such claims were false, fictitious and fraudulent and made knowingly and intentionally, "willfulness" has been established. As pointed out on page 47 of the opinion:

"Generally, under our system of criminal law, an individual is only punished when he has the requisite criminal intent accompanying the performance of the act. To have this requisite intent, the individual must be aware that what he is doing is wrong." (Citations omitted)

Section 287 certainly meets the test even though the word "willful" does not appear in its text.

In the instant case, the jury was instructed that it must find the defendants knowingly and intentionally violated the law and knowingly and willfully falsified and concealed material facts. Additionally, the indictment charges in Count I that the defendants willfully and knowingly conspired to commit the described criminal offenses. Thus, there does not appear to be any disparity.

against the United States. Beasley argues that the legislative and HEW departmental history of the Aid to Families With Dependent Children program supports the conclusion that Congress intended that criminal prosecution involving the program be brought by state authorities and not the federal government. If Congress is dissatisfied with this or with a state's administration of the program, appellant suggests that Congress can withhold the funds or enact a federal criminal statute for violations. Kramer adds that the state acted as an independent sovereign, not as a fiscal intermediary or agent of the federal government.

Based on these grounds and others, Beasley and Kramer filed motions to dismiss in the court below. In denying the motions, the district judge dealt with appellants' contentions in language totally expressing our conclusions. Judge Rubin stated:

> It is clear that in Title IV–A the Congress, and the promulgators of the federal regulations, hoped to leave with the state agency the major responsibility for administering individual programs. But what they set up, and what the defendants rely upon in their argument, is an administrative structure and a regulatory scheme for checking its functional efficiency. That structure does not affect, and it certainly does not even purport to suspend, the criminal laws of the United States. Indeed, part of the Social Security Act that specifically applies to Title IV–A creates a federal, criminal penalty for fraud. See 42 U.S.C. § 1307. A Congress bent on 'insulating' private subcontractors from the criminal laws would hardly create a new federal crime applicable to them.

> The indictment charges violations of federal law that do not depend on the particular structure of Title IV–A's administration. It charges that the defendants violated duties created by the criminal laws, not by the Social Security Act. See *Harney v. United States,* 1 Cir. 1962, 306 F.2d 523; *United States v. Thompson,* 6 Cir. 1966, 366 F.2d 167; *United States v. Candella,* 2 Cir. 1974, 487 F.2d 1223,

cert. den. 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872. It may be true, as the defendants argue, that they were accountable only to the State of Louisiana for the way in which they administered their Title IV–A program. They are accountable to the United States, however, if they have violated its criminal laws in the course of that administration, just as they would be if they had violated the federal narcotics laws in the course of administering a state program.

Second, the defendants argue that they cannot be held accountable to the federal government because the work of the Family Health Foundation was done on contract for the state, not the federal government. There is some suggestion, particularly by defendant Kramer, that this prosecution by the federal government violates state sovereignty and freedom of contract, in derogation of the Tenth Amendment. The short answer to these arguments is that the indictment does not charge a breach of contractual duty; it charges a violation of the federal criminal law. It would be a strange interpretation of federalism that left the United States unable to prosecute people for the conspiracy to defraud it.

Finally, defendant Kramer argues that he cannot be tried for submitting false claims to the government, as Counts II and III of the indictment charge he did, because the Foundation submitted claims for payment only to the State; the State then made the actual claims for federal reimbursement. To state this argument is virtually to dispose of it. Whether the defendants submitted the false claims themselves or used an intermediary to do so, they are liable if they made the claims knowing they were false and fraudulent. They could not escape liability by using a cats-paw, even if their proxy was the State.

█ Case law supports federal jurisdiction and a violation of federal criminal law when false claims are presented to the United States through an intermediary. For example, in *United States ex rel. Mar-*

*cus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1942), the defendants were local contractors who contracted with local governmental units to do work on Public Works Administration (P.W.A.) projects. A large portion of the money paid these contractors was federal in origin although payment itself, in the sense of the direct transferring of checks, was done in the name of local authorities after monthly estimates were submitted by .the contractors. When charges were brought against defendants for their collusive bidding practices, the Supreme Court was called upon to construe R.S. § 5438,[13] the forerunner of § 287. Holding that this scheme did come within the statute, the Supreme Court stated:

> Government money is as truly expended whether by checks drawn directly against the Treasury to the ultimate recipient or by grants in aid to states . . . These provisions, considered together, indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government. 317 U.S. at 544–45, 63 S.Ct. at 384.

In *United States v. Catena,* 500 F.2d 1319 (3rd Cir. 1974), the court affirmed the conviction of a physician who presented false Medicare claims to the United States through Blue Shield and Travelers insurance companies, finding that the evidence showed the defendant had "caused" the false claims to the government. The court did not reach the question of whether the insurance companies could fall within the definition of agencies of the United States,

> because we believe that the indictment and proof were sufficient to sustain the conviction on the theory that the defendant "caused" the private insurance carriers themselves to submit his false claims to the Department of Health, Education

and Welfare (HEW) and to the Railroad Retirement Board, which are clearly federal agencies.

Commenting on *Hess, supra,* and its applicability to cases brought under the modern version of the false claims statute, § 287, the court stated:

> It may be contended, however, that the revised version of the statute, which refers to presenting false claims to an agency of the United States but not to *causing* false claims to be presented, precludes conviction of the defendant on the theory of *Hess.* We do not believe that this conclusion would be correct. The "cause" language of the former version of § 287 has clearly been replaced by 18 U.S.C. § 2(b) . . . Just as under the former version of § 287 at issue in *Hess,* under the combination of the present version of § 287 and the present § 2(b) a person may be guilty of causing a false claim to be presented to the United States even though he uses an innocent intermediary (in this case the insurance carriers) to actually pass on the claims to the United States. [citation and footnotes omitted]. 500 F.2d at 1322–23.

In *United States v. Del Toro,* 513 F.2d 656 (2nd Cir. 1975), the defendants were convicted of bribing a federal public official, conspiracy to defraud the United States in the performance of its lawful functions, and of several counts of making false declarations. The appellate court found that although an assistant administrator of a New York model cities program who was a city employee was not a public official within the statute making it illegal to offer a bribe to an officer or employee or person acting on behalf of the United States (18 U.S.C. § 201), the alleged conspiracy was nonetheless within the federal criminal jurisdiction.

In *United States v. Candella,* 487 F.2d 1223 (2nd Cir. 1973), *cert. denied* 415 U.S.

---

**13.** R.S. § 5438, the forerunner of § 287, began with the language:

> Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any person or officer in the civil . . . service of the

United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent . . .

977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974), the defendants were convicted of making false statements in matters within the jurisdiction of the United States Department of Housing and Urban Development [HUD]. The circuit court held that even though the affidavits submitted by the defendant-movers were executed on forms prepared by the city and not by HUD, the affidavits were within the purview of the false claims statute where the city entered into contracts with the United States on specific urban renewal projects which prompted the moving, the United States became ultimately responsible for paying 100% of moving expenses incurred by concerns involved, and movers were made aware that the city would make affidavits available to HUD for reimbursement purposes and that false statements would be violative of the United States Code. Affirming the convictions and upholding federal jurisdiction, the court distinguished *Lowe v. United States,* 141 F.2d 1005 (5th Cir. 1944):

> In that case, an employee of a private shipbuilder made a false statement to his foreman as to the number of hours he had worked on a particular day. The company had an agreement with the United States Maritime Commission under which it was reimbursed for its payroll costs. The court held that the payroll department of the shipyard company was not an agency of the United States, nor was it controlled or supervised by the federal agency. Hence, there was no offense against the United States. The fact pattern here was, of course, markedly different. Urban renewal is a joint enterprise of the City and the Federal Government. Each government cooperates in the funding of federally assisted projects. The City is responsible for administering federally funded projects, as well as those in which it provides the funding alone. The City's procedures for direct payment to movers are subject to explicit regulation, supervision and audit by HUD. 487 F.2d at 1226.

In *Harney v. United States,* 306 F.2d 523 (1st Cir. 1962), federal jurisdiction was sustained over an indictment which alleged that defendants and others conspired to divert to their personal use money which was paid by the Commonwealth of Massachusetts for realty condemned for a federal aid highway, in derogation of the purposes of the federal aid highway program. Finding that the indictment alleged an offense under 18 U.S.C. § 371, the court held:

> [C]heating or overreaching the Commonwealth with respect to the amount it paid for land taken by it for federal highway purposes would in the end expend itself upon the federal government to the extent of 90% under the federal aid road act thereby obstructing one of its lawful functions and if successful subjecting it to pecuniary loss by causing it to pay more than it needed to for the land. The legal sufficiency of the indictment is so clear as not to require further discussion. [Citations omitted]. 306 F.2d at 527.

The same rationale has been followed under similar circumstances.[14]

■ Thus, we hold that false claims submitted to the state when the claimants knew that the state would rely on these claims for reimbursement from the federal

---

14. For further examples, see *United States v. Bass,* 472 F.2d 207, 212 (8th Cir. 1973), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1974) (affirmed conviction for false and fraudulent statements when defendants misrepresented to general contractor and ultimately United States Air Force unacceptable component parts for aircraft as acceptable parts); *United States v. Waters,* 457 F.2d 805 (3rd Cir. 1972) (false statements made to Urban League of Philadelphia, a contractor with the United States Department of Labor); *Ebeling v. United States,* 248 F.2d 429 (8th Cir. 1957), *cert. denied sub nom., Emerling v. United States,* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 261 (subcontractor knew or should have known that false invoices submitted to prime contractor doing work for the United States Department of Army bore relation to matter within federal agency and within federal jurisdiction); *United States v. Thompson,* 366 F.2d 167 (6th Cir. 1966) (defendants who, as members of county council, solicited and received kickback from architects on county hospital project under federal Hill-Burton Act in return for causing employment of architects for such project held to have violated general conspiracy statute and committed offense against the United States).

government pursuant to a joint federal-state program fall within the federal false claims statute. Therefore, the claimants' actions satisfy federal criminal jurisdiction and the indictment is sufficient in this respect.

 Kramer next contends that there was insufficient evidence to support a finding that he had the requisite intent to commit the alleged offenses. We have reviewed the record and conclude that the intent of the defendant presented a classical jury question. There was certainly ample evidence for submission of this issue to the jury and they resolved it. Thus, this assignment of error is frivolous.

 Appellant Kramer also claims he was denied due process of law because of the admission into evidence of testimony which he suggests was highly prejudicial and irrelevant to the material facts at issue. Appellant is referring here to evidence of money received by him from the Foundation for salary, legal services, travel expenses for him and his family, and severance pay. He contends that even if this evidence supported other crimes, those crimes were not similar to the ones charged here and thus the admission of such testimony was reversible error especially in the absence of a limiting instruction regarding its purpose.

We find this evidence was properly admitted. In addition to showing a pattern in appellant's conduct, this evidence assisted the finders of fact in ascertaining the accuracy, truthfulness and sincerity of appellant's testimony on direct examination regarding his financial status and relationship to the Family Health Foundation.

Kramer next complains that he was placed in double jeopardy by being subsequently tried after the granting of a severance during the first trial. The record reveals that Beasley originally filed a motion for severance based on the assertion that Kramer would testify on Beasley's behalf if they were not tried jointly. The judge held the motion in abeyance, stating that he would grant the severance if Kramer testified in accordance with his affidavit which accompanied Beasley's motion. When Kramer was called by Beasley he took the witness stand and did indeed testify as he said he would. The court then took a recess and held a conference with counsel. At the conference, the judge offered to grant the severance and a mistrial as to Kramer, if Kramer after giving it serious thought made a motion for a mistrial. During the course of the conference the judge stated:

> I do propose, unless there is some thought that Mr. Kramer is being placed in double jeopardy or that his interests are not served by his motion for a mistrial, to grant it in his own interest.

Kramer emphasized that he did not wish to waive any right to a claim of double jeopardy at another trial but then made a motion for mistrial, which the court granted. The trial continued as to Beasley, and the government subsequently started a new trial against Kramer.[15]

The government submits that Kramer's motion for mistrial (which it urges served Kramer's own interests) fits within the general rule that such a motion removes any bar to re-prosecution [16] and that this case does not fall within the exceptions where judicial or prosecutorial overreaching occurred.[17]

On the other hand, Kramer argues that he did not consent to a mistrial or voluntarily ask for it, but was forced to request it in

---

**15.** The jury at Beasley's first trial returned a hung verdict causing a mistrial, so the government also started a new trial against Beasley.

**16.** *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *United States v. Iacovetti,* 466 F.2d 1147 (5th Cir. 1972), *cert. denied,* 410 U.S. 908, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973); *Vaccaro v. United States,* 360 F.2d 606 (5th Cir. 1966).

**17.** *United States v. Jorn, supra,* n.16. *Gori v. United States,* 367 U.S. 364, 369, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); *United States v. Dinitz,* 492 F.2d 53 (5th Cir. 1974).

order for the court to grant a severance, a condition the court did not impose when originally ruling on the severance motion or prior to Kramer taking the witness stand.

■ We find no misjoinder on the face of this indictment and under the facts of this case. The procedure followed by the lower court is perfectly proper. A motion for severance based on exculpatory testimony offered by a co-defendant may await disposition until the trial judge has the opportunity to determine the content of the defendant's testimony. A motion for separate trial is addressed to the discretion of the trial court, reviewable only for abuse of discretion. *Byrd v. Wainwright*, 428 F.2d 1017, 1018 (5th Cir. 1970). There was no abuse of discretion here. It should also be noted that appellant did not raise the issue of former jeopardy prior to his second trial as required by Rule 12(b) of the Federal Rules of Criminal Procedure.[18]

■ Next, Kramer asserts the district court at the conclusion of Moore's testimony erroneously instructed the jury, over defense objections, as to the law on recantation of false testimony.[19] Appellant contends that the instruction given by the court at the specific time it was given led the jury to believe that the witness Moore was no longer subject to prosecution for perjury or false declarations when, if the jury knew Moore was still subject to prosecution, they may have scrutinized the witness' credibility more carefully.

We find that the language used by the trial judge, if error, was not prejudicial to the appellant. Although technically it may not have been correct, in the context of what the judge was doing, the instruction given was satisfactory.

Kramer also complains that the jury instructions given at the conclusion of the trial constituted plain error. Appellant contends the court failed to give any instructions or proper instructions regarding the words "false, fictitious or fraudulent," a requirement of willfulness, the meaning of "no legitimate authorized expenditures" and "actual operating cost", the need for witness protection, and the testimony of an accomplice.

■ Appellant registered no timely objection to the court's instructions to the jury, nor requested further instructions. Rule 30, F.R.Crim.P., thus precludes review of the jury instructions unless plain error under Rule 52, F.R.Crim.P., is present. Considering the record as a whole, we find

---

**18.** Appellant claims he did not pursue the former jeopardy issue before the trial court for two reasons: first, because he expected an adverse ruling due to the judge's comments at the conference regarding Kramer's motion for mistrial, and secondly, due to extensive pre-trial publicity, Kramer felt there was a great potential for prejudice to the prospective jurors which might result from appellant's unsuccessful attempt to avoid prosecution by utilization of a technicality.

This Court does not sympathize with either of the above reasons. A defendant cannot read a judge's mind and therefore should not hesitate to make a motion simply because it was once denied previously. In the instant case the judge had not even denied the motion but had only declined at that time to forecast a ruling either way. Furthermore, voir dire would have eliminated any prejudicial jurors so that appellant should not have let this fear influence him. Double jeopardy is hardly a technicality.

**19.** The judge instructed as follows:

There is a provision in the laws of the United States to the effect that if a witness is called before a grand jury and even though

he has once told an untruth before the grand jury, if ultimately before the proceedings of that grand jury are completed he recants and tells the truth he may be exonerated for the perjury previously committed.

The reason for that law is to give a person who later repents a chance to exonerate himself by telling the truth. Obviously if a person who does not recant and tell the truth [he] may be charged with perjury and indeed, if what he last says is untrue he may still be charged with perjury, but it is to hold some incentive out to a person who initially decides that he ought to lie to change his story and tell the truth if he has the will to do so. Appellant suggests the court's instruction was erroneous in two respects: (1) in addition to a person admitting the falsity of previous testimony, § 1623 also requires that the original declaration must not have substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed; and (2) a person committing perjury may still be prosecuted under 18 U.S.C. § 1621 despite his recantation under § 1623(d).

that there is no plain error under the instant facts.[20] The evidence against the appellant is overwhelming and the instructions given to the jury did not in any way prejudice him.

Briefly, Kramer's next contention is that proof of more than one conspiracy caused a variance between the indictment and the evidence, affecting substantial rights of the appellant. The proposed different conspiracies are (1) conspiracy relating to the payment of funds to Copelin and to presentation of false claims, and (2) conspiracy to conceal past activities of the Foundation.

■ Our review of the record indicates that one conspiracy was alleged and proved. A conspiracy with multiple objectives in no way negates the existence of that conspiracy.

■ Finally, Kramer asserts that as a matter of law the reports described in the third object of the conspiracy are immaterial to any matter within the jurisdiction of a federal agency, and further, that there is insufficient proof to establish an agreement to deceive HEW by the submission of these documents. Thus, appellant contends the lower court erred by not granting his motion to dismiss the third object of Count I or, alternatively, should have granted his motion for acquittal as to that portion of Count I.

The Supreme Court in *Bryson v. United States*, 396 U.S. 64, 70–71, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969), held that the term "jurisdiction" in Title 18, U.S.C. § 1001 should not be given a narrow or technical meaning. The court further held that a statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001. In *United States v. Lambert*, 501 F.2d 943, 946 (5th Cir. 1974), the court held that the § 1001 language "matter within jurisdiction" of a federal agency must be given a broad, non-technical meaning.

HEW had statutory authority to conduct the audit herein and any matters related to the audit fell within the "jurisdiction" of that agency. In ruling on the defendant Beasley's motion to suppress audit evidence, the district judge reviewed the statutory authority which empowered HEW to conduct the audit and concluded:

Under the federal regulations in effect at the time the audit was commenced and under the regulations that became effective during its course, the HEW audit of the Family Health Foundation was authorized.

Thus, the reports about which Kramer now complains (the "Modular Clinic Report" and the "Response Audit") were material to the proof of the conspiracy and its third objective and are within the jurisdiction of a federal agency. Once again, there is an abundance of evidence in this matter and this issue is without merit.

## CONCLUSION

We hold that the district court did not err in overruling appellant Beasley's alternative motion to dismiss the indictment or for new trial. There is substantial evidence, taking the view most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), to support the verdicts of the juries.

The convictions of Beasley and Kramer are affirmed and the denial of Beasley's motion to dismiss or, in the alternative, for new trial is affirmed.

**20.** According to the Record, the charge to the jury did include the standard instruction on credibility of witnesses with the admonition to consider the motives and relationship of the witness. The instructions also included brief statements by the trial judge regarding protection of witnesses and the fact that no inference is to be drawn from other people's names in the indictment.